JM:SPC/JAN
F.#2007R01328

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

  - against -

RALPH CIOFFI and
MATTHEW TANNIN,

       Defendants.

- - - - - - - - - - - - - - - - X

I N D I C T M E N T

Cr. No. _____
(T. 15, U.S.C., §§ 78j(b)
and 78ff; T. 18, U.S.C.,
§§ 371, 1343, 2,
981(a)(1)(C) and
3551 et seq.; T. 21
U.S.C. § 853(p); T. 28
U.S.C. § 2461(c))

THE GRAND JURY CHARGES:

INTRODUCTION

      At all times relevant to this Indictment, unless otherwise indicated:

I.  Background

    A.  The Defendants and Relevant Entities

      1.  Bear Stearns Companies, Inc. ("BSC") was a Delaware corporation. BSC was a holding company that held various subsidiaries, including Bear Stearns & Co., Inc. ("Bear Stearns") and Bear Stearns Asset Management ("BSAM").

      2.  Bear Stearns was a Delaware corporation with its principal place of business in New York, New York. Bear Stearns was a global financial institution with investment banking, securities trading and brokerage operations.

      3.  BSAM was a New York corporation with its principal

place of business in New York, New York.  BSAM was a registered investment adviser, which meant a company that engaged in the business of advising others on their securities investments, that had approximately $45.6 billion in assets under management as of June 30, 2007.  Those assets were held in various investment vehicles, including a number of hedge funds.

4.    Bear Stearns High Grade Structured Credit Strategies Master Fund Ltd. (the "High Grade Fund") was a hedge fund registered as a Cayman Islands corporation with its principal place of business in New York, New York.

5.    Bear Stearns High Grade Structured Credit Strategies Enhanced Master Fund Ltd. (the "Enhanced Fund") was a hedge fund registered as a Cayman Islands corporation with its principal place of business in New York, New York.

6.    Bear Stearns Securities Corporation ("BSSC") served as the Funds' prime broker, and acted as custodian for the Funds' assets.  In its role with respect to the Funds, BSSC transmitted various documentation concerning the Funds to the Funds' administrator and the Funds' portfolio managers.  BSSC was located in Brooklyn, New York.

7.    The defendant RALPH CIOFFI was the founder and senior portfolio manager of the High Grade Fund and the Enhanced Fund (together, the "Funds") from the inception of the High Grade Fund in October 2003 through at least July 2007.

8.   The defendant MATTHEW TANNIN was a portfolio manager for the Funds who reported directly to CIOFFI.  He served in that position from the inception of the High Grade Fund in October 2003 through at least July 2007.

9.   As employees of BSAM and managers of the Funds, CIOFFI and TANNIN owed duties to BSAM, the Funds and the Funds' investors.  Some of the Funds' investors resided within the Eastern District of New York.

B.   Relevant Terms

10.  A hedge fund's Net Asset Value ("NAV") meant the value of the hedge fund's assets less the value of its liabilities, and was expressed either as the total net value for the entire hedge fund or as the net value for each share of the hedge fund.

11.  A Repurchase Agreement ("Repo"), was a loan arrangement used by hedge funds to create additional buying power. In a typical Repo transaction, the lender purchased securities from the borrower for less than their actual value.  At the end of the term of the loan, the lender would sell the securities back to the borrower.  The parties would agree on the period for the loan and the purchase and sale prices for the securities.  The securities effectively served as collateral for the loan.  If, during the course of the transaction, the value of the securities decreased, the lender could demand in a margin call that the

borrower give the lender additional collateral.  Repo transactions
were frequently renewed after their initial expiration.

12.  A subprime mortgage was a mortgage obtained by a
borrower with a relatively poor credit history or weaker financial
credentials than a borrower who qualified for a prime mortgage.

13.  A hedge fund's liquidity generally referred to the
amount of cash or cash equivalents held by the hedge fund.

14.  A collateralized debt obligation ("CDO") was a
security that was backed by a pool of debt securities, such as
mortgages.  The debt securities generated interest, which belonged
to the CDO.  A CDO was typically divided into tranches, and a CDO
investor could have owned part or all of one or more tranches.
The highest tranche was the most secure because it was the last
tranche to lose interest payments and return of principal if the
underlying debtors defaulted on their mortgages.  Because the
highest rated tranche was the safest, its owners were entitled to
the smallest percentage of the interest payments owed to the CDO
owners.  The lowest tranche was the equity tranche, which was the
riskiest because it was the first tranche to be denied interest
payments and return of principal if the underlying debtors
defaulted on their mortgages.  As compensation for accepting
higher risks, the equity tranche holders were entitled to the
highest percentage of the interest rate payments flowing to the
CDO.

15.  A CDO-squared was a CDO that was backed by other CDOs.

16.  The different tranches of CDOs and CDO-squareds generally received ratings from a ratings agency such as Standard & Poor's, Moody's Investor Service and Fitch Ratings.  The rating was intended to reflect the risk of default by the relevant debtor or debtors.  The highest possible rating, using the Standard & Poor's rating scale, was AAA.  AAA rated securities supposedly carried an extremely limited risk of default.  The highest tranche of a CDO was generally rated AAA, while the lower tranches generally received lower ratings, such as AA, A or BBB.  Debt securities that carried a high risk of default, such as the lowest tranche of a CDO, may have been unrated.

II.  The Formation and Marketing of the Funds

17.  The High Grade Fund was opened to investors in October 2003.  CIOFFI supervised a group of BSAM employees, whose number increased over time, as members of his fund team.  CIOFFI, TANNIN and others told investors that the High Grade Fund invested in low-risk, "high grade" debt securities, primarily AAA and AA rated tranches of CDOs.  The High Grade Fund enhanced its ability to generate returns through leverage.  It borrowed money through, among other means, Repo agreements in order to purchase additional income-producing assets, such as CDOs.  The use of leverage enhanced returns by allowing the High Grade Fund to borrow at

lower interest rates than it received from the assets it purchased
with the proceeds of Repo loans.

18.  As described to investors by the defendants and
others, the High Grade Fund's objective was to provide a modest,
safe and steady source of returns to its investors.  CIOFFI,
TANNIN and others told investors that they could expect annual
returns of approximately 10 to 12%, and that the High Grade Fund
was not designed to hit "home runs."  The defendants and others
led investors to believe that the High Grade Fund was only
slightly riskier than a money market fund.

19.  For a considerable period, the High Grade Fund's
performance was generally consistent with these representations.
By 2006, however, the fund's performance had begun to decline.  In
part as a response to this performance decline, and as a
consequence of threatened investor withdrawals of money
("redemptions") from the High Grade Fund, CIOFFI, TANNIN and
others opened the Enhanced Fund in August 2006.

20.  The Enhanced Fund invested primarily in CDOs.  It
employed substantially more leverage than the High Grade Fund.
CIOFFI, TANNIN and others told investors that the Enhanced Fund
would generate greater profits than the High Grade Fund, but that
the Enhanced Fund would carry only limited additional risk, in
part because it would invest in an even higher proportion of the

least risky securities.  The increased profits would result from increased leverage.

21.  CIOFFI and TANNIN told, and caused others to tell, investors that they had invested their own money in the Funds. The fact that hedge fund managers had their own money in a fund was critically important to investors because it expressed the managers' faith in the fund and aligned the interests of managers with those of investors.

22.  As of July 31, 2006, investors had invested a total of approximately $1.527 billion in the High Grade Fund.  When the Enhanced Fund opened, many High Grade Fund investors switched their investment to the Enhanced Fund.  They did this, in significant part, because CIOFFI and TANNIN told, and caused others to tell, investors that they were moving their own personal funds from the High Grade Fund to the Enhanced Fund.

23.  As of January 31, 2007, both Funds had reported positive monthly returns for each month since their respective inceptions.

III. The Defendants' Fraudulent Scheme

24.  Starting at least by March 2007, CIOFFI, TANNIN and others believed that the Funds were in grave condition and at risk of collapse.  Rather than disclosing the true state of the Funds to investors and lenders, thus allowing an orderly wind-down of the Funds, CIOFFI and TANNIN agreed to make misrepresentations in

the ultimately futile hope that the Funds' bleak prospects would change and that their incomes and reputations would remain intact. On June 9, 2007, when the Funds' collapse was imminent, CIOFFI stated that, "[i]f I can't [turn the Funds around] I've effectively washed a 30 year career down the drain."

      25.  In executing their scheme, as detailed below, CIOFFI and TANNIN, together with others, misrepresented or omitted material facts in communications with investors and lenders about a variety of topics, including the financial prospects of the Funds, their opinions regarding the financial prospects of the Funds, their personal investments in the Funds, the Funds' investor redemption requests, the Funds' liquidity picture, and the Funds' exposure to the subprime mortgage market.

    A.    The Development of the Funds'
        Performance and Liquidity Problems

      26.  In February 2007, the Enhanced Fund reported a return of approximately -.08%, which was the first time that either of the Funds had a negative monthly return.  The High Grade Fund reported a return of approximately 1.5%.

      27.  On March 2, 2007, CIOFFI hosted an informal meeting attended by TANNIN and two other members of the Funds' portfolio management team.  CIOFFI talked about the extremely difficult month the Funds had experienced in February, stated that the Funds had averted disaster and led a vodka toast to celebrate surviving the month.  Before ending the meeting, CIOFFI directed those

present not to talk about the Funds' difficulties with others, including other members of the Funds' team.

28.   Throughout March 2007, CIOFFI consistently acknowledged to TANNIN and others that he was deeply concerned about the state of the Funds, particularly because of the Funds' exposure to the subprime mortgage market.  On March 3, CIOFFI told TANNIN that at least "[w]e have our health and families . . . [w]e are not a 19 year old Marine in Iraq. . .."  Later that day, CIOFFI told TANNIN, "the worry for me is that sub prime losses will be far worse than any thing people have modeled. . . ."  As early as March 11, 2007, CIOFFI had already concluded that, "[w]e will be hard pressed to be up in [the High Grade Fund] or [the Enhanced  Fund] in March."  Four days later, CIOFFI wrote an email to a colleague, stating that "I'm fearful of these markets.  Matt [TANNIN] said it's either a melt down or the greatest buying opportunity ever, I'm leaning more towards the former.  As we discussed it may not be a melt down for the general economy but in our world it will be."  Toward the end of March, the performance of the Funds had deteriorated to the point where CIOFFI expressed to a Funds team member that, "I'm sick to my stomach over our performance in [M]arch."

29.   CIOFFI was also concerned about the Funds' liquidity position, especially that of the High Grade Fund. Internal BSAM reports showed throughout March 2007 that the High

Grade Fund was in an extremely precarious liquidity position.
CIOFFI was particularly concerned that he needed to sell the
Funds' assets at unfavorable prices to meet margin calls from Repo
lenders.  On March 14, CIOFFI acknowledged to a team member that,
"[w]e do need to take positions down in [the High Grade Fund].  We
are getting loads of margin calls."  CIOFFI, TANNIN and others on
the portfolio management team were so concerned about the High
Grade Fund that they discussed the possibility of merging it with
the Enhanced Fund.

> 30.  Despite his growing concern about liquidity, CIOFFI
made material misrepresentations about that subject, including a
false statement to a Repo lender in March 2007 that the Funds had
more than enough liquidity to meet any likely eventuality.

B.    The Defendants' Attempts to Entice
      More Investor Money into the Funds

> 31.  Despite the information available to CIOFFI and
TANNIN concerning the poor health of the Funds, they continued to
tout the Funds throughout March 2007 in an effort to improve the
Funds' liquidity positions by enticing more capital into the Funds
and by staving off any potential redemptions.

> 32.  CIOFFI and TANNIN told, and caused others to tell,
investors throughout March 2007 that the market presented a buying
opportunity.  On March 7, CIOFFI told a Bear Stearns broker who
had more than 40 of his clients invested in the Funds that CIOFFI
believed the market was such that, "we have an awesome

opportunity." On the same day, TANNIN told the same broker, "I think [CIOFFI] and I are in agreement that we are looking at some great possibilities for the coming months. I don't know where you are putting your money now but I would suggest we speak about adding more to the fund. That's what I'm thinking." Similarly, TANNIN told investors that he believed that the market presented tremendous "buying opportunities" and that TANNIN himself was so confident in the Funds' prospects that he was going to add money to his investments. For example, on March 15, TANNIN told an investor, that "[w]e are seeing opportunities now and are excited about what is possible. I am adding capital to the Fund. If you guys are in a position to do the same I think think [sic] this is a good opportunity." CIOFFI's and TANNIN's goal in making these representations was to convince investors to invest additional sums in the Funds. In an email message to another member of the portfolio management team at the end of March 2007, TANNIN expressed satisfaction at his success in convincing investors to add more capital to the Funds: "[b]elieve it or not - I've been able to convince people to add more money. . .."

33. In contrast with CIOFFI and TANNIN's representations to investors that the Funds had tremendous opportunities to buy undervalued assets, CIOFFI told TANNIN and another team member on March 15 that the Funds "have to be very light on the investment side and continue to raise cash in [the

High Grade Fund] and maintain cash in [the Enhanced Fund],"
primarily to meet margin calls.

34.   Despite his repeated representations to investors
that he was going to add to his own investment in the Funds,
TANNIN never did so.

C.   Cioffi's Transfer of His Own
     Money Out of the Enhanced Fund

35.   CIOFFI acted on his fear of the Funds' incipient
meltdown.  On March 23, 2007, CIOFFI started the process of
transferring $2 million of his approximately $6 million investment
in the Enhanced Fund to another Bear Stearns hedge fund,
Structured Risk Partners ("SRP"), for which CIOFFI had supervisory
oversight, effective April 1, 2007.  SRP, as CIOFFI knew, had
recently experienced returns far superior to those of the Funds.
In fact, on March 22, 2007, in relating to BSAM's president the
returns of the Funds and SRP, CIOFFI stated, "at least [SRP] keeps
getting better."

36.   Despite receiving repeated questions from investors
about his personal investments in the Funds, a material factor in
investors' investment decisions, CIOFFI never told them that he
had transferred $2 million out of the Enhanced Fund and into SRP.
Moreover, CIOFFI falsely informed BSAM that he made the switch so
that one of the SRP managers would have a personal investment in
SRP.

D.    Redemption by a Major Investor

37.   Both Funds experienced losses for March 2007.  The
High Grade Fund reported a return of -3.71% and the Enhanced Fund
returned -5.41%.

38.   One of the three largest investors in the Funds
("Major Investor #1"), whose identity is known to the Grand Jury,
told CIOFFI on April 18 that it was considering redemption of its
approximately $57 million investment.  Among other things, CIOFFI
falsely informed Major Investor #1 that he and the other portfolio
managers had $8 million invested in the Funds and that this
represented one-third of their liquid net worth.  CIOFFI failed to
inform Major Investor #1, however, that he had recently withdrawn
$2 million of his approximately $6 million investment from the
Enhanced Fund.

39.   Major Investor #1 informed BSAM the next day that
it wished to redeem its entire $57 million investment.  CIOFFI and
TANNIN were aware of Major Investor #1's intention to redeem its
investment.

E.    Tannin's Recognition of
      The Funds' Imminent Collapse

40.   On April 19, 2007, a member of the Funds' portfolio
management team produced a CDO report (the "CDO Report") that
showed that CDOs held by the Funds were worth significantly less
than had previously been determined.

41.  On April 22, TANNIN recommended to CIOFFI that they either shut the Funds down or significantly change the Funds' investment strategies.  In an email message, TANNIN advised CIOFFI and another manager of the Funds that, "over the last few months" he had believed that the Funds should either be closed or "get very very aggressive."  In support of closing the Funds, Tannin stated that

> the subprime market looks pretty damn ugly . .
> . .  If we believe the [CDOs report is]
> ANYWHERE CLOSE to accurate I think we should
> close the funds now.  The reason for this is
> that if [the CDO report] is correct then the
> entire subprime market is toast. . ... If AAA
> bonds are systematically downgraded then there
> is simply no way for us to make money - ever.
> (emphasis in original)

TANNIN concluded that, "caution would lead us to conclude the [CDO Report] is right - and we're in bad bad shape."  TANNIN noted the hurdles that they would meet if they adopted a "very aggressive" investment strategy, including whether investors would remain with the Funds.  TANNIN then asked, "Who do we talk to about this? [BSAM's president]?  [Bear Stearns' co-president]?  Outside counsel?  (And here we have to be careful because our outside counsel is BSAM's counsel NOT our counsel - This is another very big issue we at least need to think about.[)]"  TANNIN circumvented Bear Stearns' email system by sending this email from his personal account to the personal email accounts of CIOFFI's wife and the other Funds manager.

42.  TANNIN cautioned CIOFFI the next day against disclosing anything to other Funds employees that could signal the extent of the Funds' troubles by stating, "I think we should be conscious of statements like 'if we sold all the assets at the mark' while we are on the desk.  We have a lot to do - and we'll do it - but I think it is important to keep everyone else as focused as possible."

43.  TANNIN and CIOFFI never disclosed the gravity of the Funds' problems to investors or more senior BSAM personnel. Instead, at a meeting on April 24, 2007, CIOFFI, TANNIN and others told senior BSAM personnel that they were confident that the Funds were in good shape and would continue to be successful.

F.   The Defendants' Multiple Misrepresentations to
     Investors on an April 25, 2007 Conference Call

44.  On April 25, 2007, CIOFFI and TANNIN hosted a conference call for Funds investors during which they made misleading statements and omitted material facts.

45.  TANNIN, in stark contrast to the grim views expressed in his email to CIOFFI of just three days before, told investors: "So, from a structural point of view, from an asset point of view, from a surveillance point of view, we're very comfortable with exactly where we are. . .. [T]he structure of the Fund has performed exactly the way it was designed to perform," and "it is really a matter of whether one believes that careful credit analysis makes a difference, or whether you think that this

is just one big disaster.  And there's no basis for thinking this
is one big disaster."

46.  CIOFFI also addressed the issue of redemptions,
which he characterized on the conference call as "the big -
obviously, the question that we've been getting from a number of
investors . . . ."  CIOFFI answered that question by falsely
claiming that, "[t]he next big redemption date would be June 30th,
and as of now, I believe we only have a couple million of
redemptions for the June 30 date. . . . I believe we have about 45
million in subscription, and 25 of that is from Bear Stearns and
those will be for, I believe those are all for May 1st."

47.  Despite the acknowledged importance of this issue
to investors, CIOFFI failed to disclose the approximately $57
million redemption submitted by Major Investor #1, with whom
CIOFFI had met on April 18, 2007.

48.  While noting the May 1 subscriptions, CIOFFI also
omitted any reference to $67 million in redemptions scheduled for
April 30 and May 31, 2007.  As for the "June 30" redemptions,
while CIOFFI stated that there were only "a couple million," in
fact, there were a total of approximately $47 million, which
included a portion of Major Investor #1's $57 million redemption.

49.  CIOFFI failed to mention that he had pulled $2
million from the Enhanced Fund only 24 days earlier.  TANNIN
failed to mention, despite contrary representations to multiple

investors, that he had not added additional money to his
investment in the Funds.

    G.   The Defendants' Continued Misrepresentations
        To Investors While the Funds Collapse

    50.  During May 2007, CIOFFI asked BSAM's Pricing
Committee, a group of professionals who were charged with
overseeing the ultimate calculation of the Funds' NAV, to use
higher values for some assets held by the Funds in calculating the
Funds' April 2007 NAV than the values that were set according to
the Pricing Committee's rules.  The values advocated by CIOFFI
would have yielded an April 2007 return of approximately -6.5% for
the Enhanced Fund.  When challenged by the Pricing Committee as to
the basis for using the higher values of the Funds, CIOFFI was
unable to produce any evidence supporting his alternative pricing
method.  Ultimately, the Pricing Committee rejected CIOFFI's
method, resulting in an April 2007 return in the Enhanced Fund of
approximately -18.97%.

    51.  On May 31, 2007, even after it became apparent that
the final return for the Enhanced Fund would be significantly
worse than the estimated return, TANNIN asked CIOFFI, "do we give
[Major Investor #2, whose identity is known to the grand jury] the
-6.5 April or the larger down April?"

    52.  CIOFFI and TANNIN also continued to misrepresent
the Funds' financial status and redemption picture in an effort to
stem the tide that ultimately resulted in the collapse of the

Funds.  On May 3, 2007, TANNIN informed a Repo lender that the
Funds anticipated no large redemptions.  In fact, between March 1
and May 3, thirteen investors, including two of the largest
investors in the Funds and CIOFFI himself, had requested
redemptions.  As late as May 30, 2007, CIOFFI told an investor
that "so far we have talked any June redemptions of note (other
than about $5M) to pull their redemptions."  Many investors, whose
cumulative redemption requests far exceeded $5 million, had not
withdrawn their June redemption requests.

53.  On at least one occasion in May 2007, CIOFFI
falsely stated that he still had $5.5 million invested in the
Enhanced Fund, omitting that he had taken $2 million of that
investment and put it into another hedge fund.

H.   The End of the Funds

54.  On June 7, 2007, investors were told that they
could no longer redeem their investments in the Enhanced Fund,
regardless of whether or not they had already submitted redemption
requests.  On June 17, 2007, investors were provided the final
April 2007 return of -5.09% for the High Grade Fund and -18.97%
for the Enhanced Fund.  On June 26, 2007, investors were told that
they could no longer redeem their investments in the High Grade
Fund, regardless of whether or not they had already submitted
redemption requests.

55.  Eventually, investors were told that the Funds had

both lost 100% of their respective values, resulting in a total investor loss of approximately $1.4 billion.

I.   The Investigation and
     The Missing Evidence

     56.   The United States Securities and Exchange Commission ("SEC") and others began investigating the Funds' collapse in the Summer of 2007.  As part of its investigation, the SEC requested that Bear Stearns produce documents and materials relating to the Funds.  While gathering the documents and materials, Bear Stearns learned that TANNIN's tablet computer, which he had used to take notes during 2007, and one of CIOFFI's notebooks, in which he had taken handwritten notes for the period January 1, 2007 to June 17, 2007, were both missing.

COUNT ONE
(Conspiracy to Commit Securities Fraud and
Wire Fraud)

     57.   The allegations contained in paragraphs one through 56 are hereby realleged and incorporated as if set forth fully in this paragraph.

     58.   In or about and between March 2007 and June 2007, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants RALPH CIOFFI and MATTHEW TANNIN, together with others, did knowingly and willfully conspire to:

          A.   use and employ manipulative and deceptive devices
               and contrivances, contrary to Rule 10b-5 of the
               Rules and Regulations of the SEC (Title 17, Code of
               Federal Regulations, Section 240.10b-5), by (a)

employing devices, schemes, and artifices to
defraud; (b) making untrue statements of material
fact and omitting to state material facts necessary
in order to make the statements made, in light of
the circumstances in which they were made, not
misleading; and (c) engaging in acts, practices,
and courses of business which would and did operate
as a fraud and deceit upon members of the investing
public, in connection with the purchases and sales
of shares of the Funds, directly and indirectly, by
use of the means and instrumentalities of
interstate commerce and the mails, contrary to
Title 15, United States Code, Sections 78j(b) and
78ff; and

B.    knowingly and intentionally devise a scheme and
artifice to defraud the Funds' investors and to
obtain money from them by means of materially false
and fraudulent pretenses, representations and
promises, and, for the purpose of executing the
scheme and artifice, and attempting to do so, to
transmit and cause to be transmitted, by means of
wire communication in interstate and foreign
commerce, writings, signs, signals, pictures and
sounds, contrary to Title 18, United States Code,
Section 1341.

59.    In furtherance of the conspiracy and to effect its

objectives, within the Eastern District of New York and elsewhere,

the defendants RALPH CIOFFI and MATTHEW TANNIN, together with

others, committed and caused to be committed, among others, the

following:

OVERT ACTS

a.    On March 7, 2007, CIOFFI told a Bear Stearns
broker, whose identity is known to the Grand
Jury, that the Funds presented an "awesome
opportunity."

b.    On or about March 21, 2007, TANNIN told a Bear
Stearns broker, whose identity is known to the
Grand Jury, that he was adding money to his
personal investment in the Enhanced Fund.

c.  On April 25, 2007, CIOFFI participated in an investor conference call during which he made material misrepresentations and omitted material facts.

d.  On April 25, 2007, TANNIN participated in an investor conference call during which he made material misrepresentations and omitted material facts.

e.  On May 3, 2007, TANNIN told a Repo counterparty that he anticipated no large redemptions.

f.  In or about mid-May 2007, CIOFFI told a Bear Stearns broker, whose identity is known to the Grand Jury, that he had $5.5 million personally invested in the Funds.

(Title 18, United States Code, Sections 371 and 3551 <u>et seq</u>.)

COUNT TWO
(Securities Fraud - High Grade Fund)

60.  The allegations contained in paragraphs 1 through 56 are realleged and incorporated as if set forth fully in this paragraph.

61.  In or about and between March 2007 and June 2007, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants RALPH CIOFFI and MATTHEW TANNIN, together with others, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants did knowingly and willfully (a)

employ devices, schemes, and artifices to defraud; (b) make untrue statements of material fact and omit to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with the purchases and sales of shares of the High Grade Fund, directly and indirectly, by use of the means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT THREE
(Securities Fraud - Enhanced Fund)

62.  The allegations contained in paragraphs 1 through 56 are realleged and incorporated as if set forth fully in this paragraph.

63.  In or about and between March 2007 and June 2007, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants RALPH CIOFFI and MATTHEW TANNIN, together with others, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants did knowingly and willfully (a) employ devices, schemes, and artifices to defraud; (b) make untrue

statements of material fact and omit to state material facts
necessary in order to make the statements made, in light of the
circumstances in which they were made, not misleading; and (c)
engage in acts, practices, and courses of business which would and
did operate as a fraud and deceit upon members of the investing
public, in connection with the purchases and sales of shares of
the Enhanced Fund, directly and indirectly, by use of the means
and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 18, United States Code, Sections 2 and 3551 et seq.)

### COUNT FOUR
(Securities Fraud - CIOFFI Insider Trading)

64.  The allegations contained in paragraphs 1 through
56 are realleged and incorporated as if set forth fully in this
paragraph.

65.  On or about and between March 23, 2007 and April 1,
2007, within the Southern District of New York and elsewhere, the
defendant RALPH CIOFFI did knowingly and willfully use and employ
manipulative and deceptive devices and contrivances contrary to
Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code
of Federal Regulations, Section 240.10b-5), in that the defendant
did knowingly and willfully (a) employ devices, schemes, and
artifices to defraud; (b) make untrue statements of material fact
and omit to state material facts necessary in order to make the

statements made, in light of the circumstances in which they were made, not misleading; and (c) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with the purchases and sales of shares of the Enhanced Fund, directly and indirectly, by use of the means and instrumentalities of interstate commerce and the mails, in that the defendant sold shares he owned in the Enhanced Fund while in possession of material non-public information regarding the Funds' liquidity, the Funds' redemptions and the Funds' prospects as described above.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

### COUNTS FIVE through NINE
(Wire Fraud)

66.   The allegations contained in paragraphs 1 through 56 are realleged and incorporated as if set forth fully in this paragraph.

67.   In or about and between March 2007 and June 2007, both dates being approximate and inclusive, within the Southern District of New York and elsewhere, the defendants RALPH CIOFFI and MATTHEW TANNIN, together with others, did knowingly and intentionally devise a scheme and artifice to defraud the Funds' investors and to obtain money from them by means of materially false and fraudulent pretenses, representations and promises.

68.   For the purpose of executing the scheme and artifice, and attempting to do so, on or about the dates set forth below, the defendants RALPH CIOFFI and MATTHEW TANNIN transmitted and caused to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, as follows:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 5 | 3/7/07, 6:12am | Email from CIOFFI to Bear Stearns broker, whose identity is known to the Grand Jury, in which CIOFFI states that the Funds have an "awesome opportunity". |
| 6 | 3/15/07, 6:49am | Email from TANNIN to an investor, informing the investor that "I am adding money to the fund.  If you guys are in a position to do the same I think think (sic) this is a good opportunity." |
| 7 | 3/18/07, 10:22pm | Email from TANNIN to an investor, stating that "Ralph and I each have about 40% of our non-real estate net worth in the fund.  I am adding more this month." |
| 8 | 4/25/07 | Investor conference call, described in paragraphs 44 through 49 herein. |
| 9 | 5/3/07 | Phone call from TANNIN to Repo counterparty in which TANNIN states that Tannin anticipates no large redemptions. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION

69.   The United States hereby gives notice to the defendants charged in Counts One through Nine that, upon their conviction of any such offense, the Government will seek

forfeiture in accordance with Title 18, United States Code,

Section 981(a)(1)(C) and Title 28, United States Code, Section

2461(c), which require any person convicted of such offenses to

forfeit any property constituting or derived from proceeds

obtained directly or indirectly as a result of such offenses.

70.   If any of the above-described forfeitable property, as a

result of any act or omission of the defendants:

(a)   cannot be located upon the exercise of due

diligence;

(b)   has been transferred or sold to, or deposited with,

a third party;

(c)   has been placed beyond the jurisdiction of the

court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which

cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), as incorporated by Title 28,

United States Code, Section 2461(c), to seek forfeiture of any

27

other property of such defendants up to the value of the

forfeitable property described in this forfeiture allegation.

        (Title 28, United States Code, Section 2461(c); Title 18,

United States Code, Section 981(a)(1)(C); Title 21, United States

Code, Section 853(p))

                                                A TRUE BILL

                                                _____
                                                FOREPERSON

_____
BENTON J. CAMPBELL
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

## INFORMATION SHEET

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NEW YORK

1. Title of Case: **United States v. Ralph Cioffi and Matthew Tannin**

2. Related Magistrate Docket Number(s): N/A

3. Arrest Date: **N/A**

4. Nature of offense(s):  ☒   Felony
                          ☐   Misdemeanor

5. Related Cases - Title and Docket No(s).  (Pursuant to Rule 50.3 of the
   Local E.D.N.Y. Division of Business Rules): _____

   _____

6. Projected Length of Trial:   Less than 6 weeks   ( )
                                 More than 6 weeks   (X)

7. County in which crime was allegedly committed: <u>KINGS</u>
   (Pursuant to Rule 50.1(d) of the Local E.D.N.Y. Division of Business Rules)

8. Has this indictment/information been ordered sealed?   (X) Yes  ( ) No

9. Have arrest warrants been ordered?   (X) Yes  ( ) No

BENTON J. CAMPBELL
UNITED STATES ATTORNEY

By: _____

Sean Patrick Casey
John A. Nathanson
Patrick Sean Sinclair
Assistant U.S. Attorneys
718-254-7000
