UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-against-

RALPH CIOFFI and MATTHEW TANNIN

Defendants.

08 CR 415 (FB)

ECF

---

**MEMORANDUM OF LAW IN SUPPORT OF MATTHEW TANNIN'S MOTION FOR A JUDGMENT OF ACQUITTAL**

Susan E. Brune
Nina M. Beattie
MaryAnn Sung
BRUNE & RICHARD LLP
80 Broad Street
New York, New York 10004
(212) 668-1900

Laurie Edelstein
BRUNE & RICHARD LLP
235 Montgomery Street
San Francisco, California 94104
(415) 563-0600

*Attorneys for Defendant Matthew Tannin*

Dated:   New York, New York
         November 2, 2009

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ............................................................................................................ 1

ARGUMENT .................................................................................................................... 4

I.   A JUDGMENT OF ACQUITTAL SHOULD BE GRANTED ON COUNTS 5, 6, 7, AND 9 BECAUSE THE GOVERNMENT FAILED TO ESTABLISH AN INTERSTATE NEXUS FOR THE WIRES ..................................................................... 5

II.  THE GOVERNMENT FAILED TO OFFER SUFFICIENT EVIDENCE OF SCHEME LIABILITY REQUIRED TO ESTABLISH SECURITIES FRAUD UNDER SUBSECTIONS (A) AND (C) OF RULE 10B-5 ................................................ 7

III. THE GOVERNMENT FAILED TO ESTABLISH THAT MR. TANNIN MADE A MATERIAL MISREPRESENTATION IN CONNECTION WITH THE PURCHASE OR SALE OF A SECURITY ................................................................... 11

   A.  Mr. Tannin's Statements Regarding His Personal Investment in the Funds Were True When Made ......................................................................................... 12

   B.  Mr. Tannin's Forward-Looking Statements of Optimism Were Immaterial as a Matter of Law and Cannot Support a Conviction for Securities Fraud .......... 15

      1.  Mr. Tannin's optimistic statements were immaterial as a matter of law .. 16

      2.  Mr. Tannin had no duty to disclose internal deliberations of the Funds... 20

   C.  The Government Failed to Present Sufficient Evidence that Mr. Tannin's Statements Regarding Redemptions Were Untrue Statements of Material Fact ................................................................................................................... 21

   D.  The Government Failed to Present Sufficient Evidence That an Investor Reasonably Relied on Any Alleged Misstatement or Misleading Omission in Connection with a Purchase or Sale ................................................................ 22

      1.  Insufficient Evidence of a Purchase or Sale ............................................. 22

      2.  Insufficient Evidence of Justifiable Reliance ........................................... 24

IV.  MR. TANNIN'S ALLEGED OMISSIONS CANNOT SUPPORT A CONVICTION FOR SECURITIES FRAUD BECAUSE THE GOVERNMENT FAILED TO ESTABLISH THAT HE OWED A FIDUCIARY DUTY TO THE INDIVIDUAL FUND INVESTORS ................................................................................ 25

V.      THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE TO
        PROVE MATERIAL MISREPRESENTATIONS IN FURTHERANCE OF A
        SCHEME TO DEFRAUD INVESTORS ........................................................................28

VI.     A JUDGMENT OF ACQUITTAL SHOULD BE GRANTED ON COUNT 9
        BECAUSE THE GOVERNMENT FAILED TO ESTABLISH THAT THE
        TELEPHONE CALL WAS MADE IN FURTHERANCE OF THE ALLEGED
        SCHEME TO DEFRAUD INVESTORS ........................................................................29

VII.    A JUDGMENT OF ACQUITTAL SHOULD BE GRANTED ON ALL COUNTS
        BECAUSE THE GOVERNMENT FAILED TO PROVE THAT MR. TANNIN
        ACTED KNOWINGLY AND WITH THE SPECIFIC INTENT TO DEFRAUD..........30

VIII.   A JUDGMENT OF ACQUITTAL SHOULD BE GRANTED ON COUNT 1
        BECAUSE THE GOVERNMENT FAILED TO PROVE A CONSPIRATORIAL
        AGREEMENT.................................................................................................................34

IX.     THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE
        THAT MR. TANNIN AIDED AND ABETTED MR. CIOFFI .......................................36

X.      THE GOVERNMENT FAILED TO ESTABLISH VENUE IN THE EASTERN
        DISTRICT FOR THE CONSPIRACY AND SECURITIES FRAUD COUNTS
        (COUNTS 1 THROUGH 3) ............................................................................................37

CONCLUSION.........................................................................................................................38

# TABLE OF AUTHORITIES

## CASES

Page

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)...................................................................................13

*Acito* v. *Imcera Group, Inc.*,
47 F.3d 47 (2d Cir. 1995) ...................................................................................33

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)...................................................................8

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988)...................................................................................11, 14

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004)................................................................17

*Chiarella* v. *United States*,
445 U.S. 222 (1980)...........................................................................................25

*Chien* v. *Skystar Bio Pharmaceutical Co.*,
566 F. Supp. 2d 108 (D. Conn. 2008)................................................................23

*Cofacredit, S.A.* v. *Windsor Plumbing  Supply Co.*,
187 F.3d 229 (2d Cir. 1999)................................................................................5

*In re Comverse Tech., Inc. Sec. Litig.*,
543 F. Supp. 2d 134 (E.D.N.Y. 2008) ...............................................................33

*DeBlasio* v. *Merrill Lynch & Co.*,
No. 07 Civ. 318, 2009 WL 2242605 (S.D.N.Y. July 27, 2009) ........................27

*Defazio* v. *Wallis*,
500 F. Supp. 2d 197 (E.D.N.Y. 2007) .................................................................5

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)...............................................................................16

*Edison Fund* v. *Cogent Inv.  Strategies Fund*,
551 F. Supp. 2d 210 (S.D.N.Y. 2008)...............................................19, 32, 33

*Elliot Assocs., L.P.* v. *Covance, Inc.*,
No. 00 Civ. 4115, 2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) .....................18

*Emergent Capital Inv. Mgmt. LLC* v. *Stonepath Group, Inc.*,
343 F.3d 189 (2d Cir. 2003)........................................................................................24

*Ganino* v. *Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)........................................................................................14

*In re Global Crossing, Ltd. Sec. Litig.*,
322 F. Supp. 2d 319 (S.D.N.Y. 2004)..........................................................................9

*Goldstein* v. *SEC*,
451 F.3d 873 (D.C. Cir. 2006) .......................................................................25, 26, 27

*In re IBM Corp. Sec. Litig.*,
163 F.3d 102 (2d Cir. 1998)............................................................................14, 17, 19

*Jackson* v. *Virginia*,
443 U.S. 307 (1979).......................................................................................................4

*Kelter* v. *Apex Equity Options Fund, L.P.*,
No. 08 Civ. 2911, 2009 WL 2599607...................................................................23, 24

*Lasker* v. *N.Y. State Elec. & Gas Corp.*,
85 F.3d 55 (2d Cir. 1996) ...............................................................................14, 15, 17

*Lentell* v. *Merrill Lynch & Co. Inc.*,
396 F.3d 161 (2d Cir. 2005)..........................................................................................8

*Leykin* v. *AT&T Corp.*,
423 F. Supp. 2d 229 (S.D.N.Y. 2006), *aff'd*, 216 Fed. Appx. 14 (2d Cir. 2007).........22

*Luce* v. *Edelstein*,
802 F.2d 49 (2d Cir. 1986)..........................................................................................13

*Mills* v. *Polar Molecular Corp*,
12 F.3d 1170 (2d Cir. 1993)........................................................................................13

*Nadoff* v. *Duane Reade, Inc.*,
107 Fed. Appx. 250 (2d Cir. 2004)..................................................................14, 16, 19

*In re Northern Telecom Ltd. Sec. Litig.*,
116 F. Supp. 2d 446 (S.D.N.Y. 2000)..........................................................................21

*Parnes* v. *Gateway*,
122 F.3d 539 (8th Cir. 1997) ......................................................................................18

*Pension Comm. of the Univ. of Montreal Pension Plan* v. *Banc of America Securities, LLC*,
592 F. Supp. 2d 608 (S.D.N.Y. 2009).......................................................................................23

*In re Royal Dutch/Shell Transport Sec. Litig.*,
No. 04 Civ. 374, 2006 WL 2355402 (D.N.J. 2006)................................................................10

*San Leandro Emergency Med. Group Profit Sharing Plan* v. *Philip Morris Cos.*,
75 F.3d 801 (2d Cir. 1996)............................................................................................17, 20, 21

*SEC* v. *Collins & Aikman Corp.*,
524 F. Supp. 2d 477 (S.D.N.Y. 2007).....................................................................................9

*SEC* v. *KPMG LLP*,
412 F. Supp. 2d 349 (S.D.N.Y. 2006).....................................................................................9

*SEC* v. *Lucent Technologies, Inc.*,
610 F. Supp. 2d 342 (D.N.J. 2009) ..........................................................................................8

*SEC* v. *Northshore Asset Mgmt.*,
2008 WL 1968299 (S.D.N.Y. May 5, 2008) ......................................................................23. 24

*SEC* v. *Simpson Capital Mgmt., Inc.*,
586 F. Supp. 2d 196 (S.D.N.Y. 2008)....................................................................................9

*SEC* v. *Stanard*,
No. 06 Civ. 7736, 2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) ....................................................22

*SEC* v. *Zanford*,
535 U.S. 813 (2002) ..................................................................................................................22

*Shields* v. *Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994)....................................................................................................32

*Starr* v. *Georgeson Shareholder, Inc.*,
412 F.3d 103 (2d Cir. 2005)....................................................................................................24

*TCS Capital Mgmt., LLC* v. *Apax Partners, L.P.*,
No. 06 Civ. 13447, 2008 WL 650385 (S.D.N.Y. Mar. 7, 2008) ....................................................9

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993) ..............................................................................................14, 20

*United States* v. *Ali*,
561 F. Supp. 2d 265 (E.D.N.Y. 2008) ....................................................................................35

*United States* v. *Altman*,
48 F.3d 96 (2d Cir. 1995) ...........................................................................................29

*United States* v. *Amato*,
15 F.3d 230 (2d Cir. 1994)..........................................................................................34

*United States* v. *Autuori*,
212 F.3d 105 (2d Cir. 2000)...........................................................................................4

*United States* v. *Beech-Nut Nutrition Corp.*,
871 F.2d 1181 (2d Cir. 1989).....................................................................................34

*United States* v. *Bongiorno*,
 No. 05 Cr. 390, 2006 WL 1140864 (S.D.N.Y. May 1, 2006) ..................................8, 9

*United States* v. *Ceballos*,
340 F.3d 115 (2d Cir. 2003)........................................................................................30

*United States* v. *Cepeda*,
768 F.2d 1515 (2d Cir. 1985)......................................................................................34

*United States* v. *Chestman*,
947 F.2d 551 (2d Cir. 1991)..........................................................................20, 25, 27

*United States* v. *Coffman*,
94 F.3d 330 (7th Cir. 1996) ........................................................................................16

*United States* v. *Dickerson*,
508 F.2d 1216 (2d Cir. 1975)......................................................................................36

*United States* v. *Ferguson*,
553 F. Supp. 2d 145 (D. Conn. 2008) .........................................................................34

*United States* v. *Finnerty*,
474 F. Supp. 2d 530 (S.D.N.Y. 2007).......................................................................8, 9

*United States* v. *Geibel*,
369 F.3d 682 (2d Cir. 2004).........................................................................................37

*United States* v. *Guadagna*,
183 F.3d 122 (2d Cir. 1999).........................................................................................30

*United States* v. *Hunt*,
No. 05 Cr. 395, 2006 WL 2613754 (S.D.N.Y. Sept. 6, 2006) .....................................9

*United States* v. *Izydore*,
167 F.3d 213 (5th Cir. 1999) ............................................................................5

*United States* v. *Labat*,
905 F.2d 18 (2d Cir. 1990).............................................................................36

*United States* v. *Lay*,
556 F. Supp. 2d 652 (N.D. Ohio 2008)..........................................................26

*United States* v. *Lazarenko*,
564 F.3d 1026 (9th Cir. 2009) ........................................................................29

*United States* v. *Lefkowitz*,
125 F.3d 608 (8th Cir. 1997) ............................................................................5

*United States* v. *Lorenzo*,
534 F.3d 153 (2d Cir. 2008)...........................................................................35

*United States* v. *Mahaffy*,
No. 05 Cr. 613, 2006 WL 2224518 (E.D.N.Y. Aug. 2, 2006)........................37

*United States* v. *Maze*,
414 U.S. 395 (1974)........................................................................................29

*United States* v. *McCall*,
298 Fed. Appx. 591 (9th Cir. 2008)................................................................34

*United States* v. *Motz*,
08 Cr. 598, 2009 WL 2486132 (E.D.N.Y. Aug. 14, 2009).............................38

*United States* v. *Naftalin*,
441 U.S. 768 (1978)..........................................................................................7

*United States* v. *Phillips*,
376 F. Supp. 2d 6 (D. Mass. 2005),
*aff'd sub nom United States* v. *Dwyer*, 238 Fed. Appx. 631 (1st Cir. 2007)...................................6

*United States* v. *Provenzano*,
615 F.2d 37 (2d Cir. 1980)..............................................................................35

*United States* v. *Rodriguez-Moreno*,
526 U.S. 275 (1999)........................................................................................38

*United States* v. *Saavedra*,
223 F.3d 85 (2d Cir. 2000)..............................................................................37

*United States* v. *Samaria*,
239 F.3d 228 (2d Cir. 2001)...........................................................................33

*United States* v. *Santos*,
128 S. Ct. 2020 (2008)..................................................................................24

*United States* v. *Schlisser*,
168 Fed. Appx. 483 (2d Cir. 2006).........................................................11, 24

*United States* v. *Skilling*,
554 F.3d 529 (5th Cir. 2009) .........................................................................11

*United States* v. *Stavroulakis*,
952 F.2d 686 (2d Cir. 1992)..........................................................................34

*United States* v. *Stewart*,
305 F. Supp. 2d 368 (S.D.N.Y. 2004)............................................................31

*United States* v. *Szur*,
289 F.3d 200 (2d Cir. 2002)..........................................................................27

*United States* v. *Tarpol*,
561 F.2d 466 (3d Cir. 1977)..........................................................................29

*United States* v. *Treacy*,
No. S2 08 Cr. 0366, 2008 WL 4934051 (S.D.N.Y. Nov. 19, 2008).........9, 10

*United States* v. *Wiley*,
846 F.2d 150 (2d Cir. 1988)..........................................................................36

## STATUTES AND RULES

15 U.S.C. § 78aa .............................................................................................37

15 U.S.C. § 78j(b) ....................................................................................... *passim*

15 U.S.C. § 80a-2(a)(51)..................................................................................19

18 U.S.C. § 1343 ...............................................................................................5

18 U.S.C. § 3237(a) .........................................................................................38

17 C.F.R. § 240.10b-5(b) ........................................................................... *passim*

Fed. R. Crim. Pro. 29 .....................................................................................1, 4

## OTHER AUTHORITIES

S. Rep. No. 104-293 (1996) ...........................................................................................................19

Pursuant to Federal Rule of Criminal Procedure 29, defendant Matthew Tannin respectfully submits this memorandum of law in support of his motion for a judgment of acquittal on all counts in the indictment.

## INTRODUCTION

This Rule 29 motion is based on significant, substantive legal issues, several of which we first raised in our pretrial motions to dismiss. The Court declined to rule on the issues at that time before allowing the government to present its case. But now, with the government's direct case completed, it is clear that, despite having called nearly 20 witnesses to testify and introducing approximately 150 exhibits, the government has failed to present sufficient evidence from which a rational trier of fact could find that the essential elements of any of the crimes charged have been established beyond a reasonable doubt. Accordingly, Mr. Tannin is entitled to a judgment of acquittal on all counts.

First, Mr. Tannin is entitled to a judgment of acquittal on all of the wire fraud counts (Counts 5, 6, 7, and 9) because the government presented insufficient evidence that the communications charged were interstate wires. No rational trier of fact could conclude beyond a reasonable doubt that the wires in Counts 5, 6, 7, and 9 crossed state lines.

Second, the government failed to present sufficient evidence to establish that Mr. Tannin made untrue statements or misleading omissions of material fact in connection with the purchase or sale of a security. Mr. Tannin's statements of present intent, his forward-looking statements of optimism, and his statements regarding the level of redemptions in the High Grade and Enhanced Funds ("the Funds") are insufficient as a matter of law to support a conviction of securities fraud. In addition, the government presented insufficient evidence that any investor justifiably relied on and made a purchase or sale of an interest in the Funds in connection with

any of the alleged misrepresentations and omissions.  A judgment of acquittal for Mr. Tannin on the securities fraud charges (Counts 2 and 3) must therefore be entered.

Third, Mr. Tannin's alleged omissions cannot support a conviction for securities fraud because the government failed to show that he owed a fiduciary duty to the individual Fund investors.

Fourth, Mr. Tannin is entitled to a judgment of acquittal on the wire fraud counts (Counts 5, 6, 7, and 9) for the additional reason that the government presented insufficient evidence that Mr. Tannin made or caused to be made a material misrepresentation in furtherance of a scheme to defraud the investors in the Funds to obtain their money or property.  Count 9 must be dismissed for another reason as well.  The government failed to prove that the wire specified in Count 9 – a call from Mr. Tannin to one of the Funds' third-party lenders – was part of the alleged scheme to defraud investors.

Fifth, because the government failed to present sufficient evidence to show that Mr. Tannin had a specific intent to defraud the investors in the Funds – a required element of all the charges in the indictment – Mr. Tannin is entitled to a judgment of acquittal on all counts.

Sixth, the government's evidence on the conspiracy count (Count 1) is insufficient to sustain a conviction on that charge because the government failed to offer sufficient evidence of an unlawful agreement between Mr. Tannin and Mr. Cioffi.

Seventh, the government failed to present sufficient evidence on an aiding and abetting liability theory.

Finally, the government has failed to meet its burden of proof and present sufficient evidence to establish venue in the Eastern District of New York for the conspiracy and securities fraud charges (Counts 1-3).  Counts 1 through 3 thus must be dismissed.

The specific grounds for Mr. Tannin's Rule 29 motion are summarized as follows:

| Count(s) | Charge | Grounds for Rule 29 Acquittal |
|---|---|---|
| 1 | Conspiracy | • Failure to prove that defendants entered an unlawful agreement<br><br>• Failure to prove specific intent to defraud<br><br>• Failure to prove venue |
| 2, 3 | Securities Fraud | • Failure to prove Mr. Tannin made a untrue statement of material fact or materially misleading omission in connection with the purchase or sale of a security<br><br>• Failure to prove specific intent to defraud<br><br>• Failure to prove venue |
| 5, 6, 7, 9 | Wire Fraud | • Failure to prove interstate nexus<br><br>• Failure to prove a false or fraudulent statement of material fact in furtherance of the alleged scheme to defraud investors in the Funds<br><br>• Failure to prove specific intent to defraud |
| 9 | Wire Fraud | • Failure to prove charged wire was made in furtherance of the alleged scheme to defraud investors in the Funds |

Because the government has failed to present sufficient evidence from which a rational trier of fact could find each of the required elements for each count charged beyond a reasonable doubt, Mr. Tannin's motion for a judgment of acquittal on all counts should be granted.

If the Court denies our motion or reserves judgment until after the jury verdict, because the government failed to present sufficient evidence to establish Mr. Tannin's participation in a

"scheme to defraud," as required under subsections (a) and (c) of Securities and Exchange Commission Rule 10b-5, on the securities fraud counts, the jury should be charged only as to the proof required to commit an offense under subsection (b) of the rule, which prohibits material misstatements and omissions.  Further, with respect to both the securities fraud and wire fraud counts, we respectfully request that the Court instruct the jury that (1) true statements of present intent do not evidence a specific intent to defraud, and (2) puffery, sales talk, and other forward-looking statements of opinion are immaterial as a matter of law.

We also request that the Court instruct the jury that Mr. Tannin owed a duty only to the Funds and that all disclosure obligations were limited to those set forth in the contractual documents governing the relationship between the Funds and the Funds' investors.  We further request that the Court prohibit the government from arguing to the jury that a hedge fund manager's motive to save his bonus and reputation is sufficient to establish the manager's specific intent to defraud.  Finally, we ask that the Court not to instruct the jury on an aiding and abetting liability theory.

### ARGUMENT

Federal Rule of Criminal Procedure 29 requires a judgment of acquittal where, as here, there is insufficient evidence to sustain a conviction.  Although a trial court is required to view the evidence in the light most favorable to the prosecution and draw all reasonable inferences in the government's favor when weighing the sufficiency of the evidence, *see United States* v. *Autuori*, 212 F.3d 105, 114 (2d Cir. 2000), a judgment of acquittal is required if the court concludes that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979).

That is the case here, as demonstrated in detail below.  No rational trier of fact could find that the government proved the essential elements of each of the charges beyond a reasonable doubt.  Accordingly, Mr. Tannin is entitled to judgment of acquittal on all counts.

**I.    A JUDGMENT OF ACQUITTAL SHOULD BE GRANTED ON COUNTS 5, 6, 7, AND 9 BECAUSE THE GOVERNMENT FAILED TO ESTABLISH AN INTERSTATE NEXUS FOR THE WIRES**

An essential element of wire fraud is that the charged wires are transmitted in interstate or foreign commerce, which means that they must cross state or international lines.  *See* 18 U.S.C. § 1343.  "[T]he interstate nexus set forth in § 1343 . . . is an immutable requirement" of the wire fraud statute.  *United States* v. *Izydore*, 167 F.3d 213, 219 (5th Cir. 1999).  "[P]urely intrastate communication [is] beyond the statute's reach."  *Cofacredit, S.A.* v. *Windsor Plumbing Supply Co.*, 187 F.3d 229, 243 (2d Cir. 1999) (citation omitted) (alteration in *Cofacredit*).  *See also Defazio* v. *Wallis*, 500 F. Supp. 2d 197, 203 (E.D.N.Y. 2007) ("Purely intrastate communications are not sufficient under the [wire fraud] statute.").

Here, the government failed to present evidence establishing that any of the wires charged in Counts 5, 6, 7, and 9 crossed state lines.  Indeed, the government did not elicit any testimony about the locations of any of the participants in these communications.  Because the record is devoid of evidence from which a reasonable jury could conclude that the wires charged in Counts 5, 6, 7, and 9 crossed state lines, the government failed to meet its burden to prove an interstate communication.

Courts have repeatedly entered judgments of acquittal after the government has failed to prove that the charged wire traveled across state lines.  For example, in *United States* v. *Lefkowitz*, 125 F.3d 608, 616 (8th Cir. 1997), the Eight Circuit Court of Appeals reversed a wire fraud conviction that was based on a call between the defendant, a California business man who made many trips to Minnesota, and a Minnesota broker-dealer.  The testimony of neither the

broker-dealer nor the defendant touched upon whether the charged call had been placed interstate, and the defendant argued on appeal that the government failed to present evidence to that effect.  In response the government argued that "[t]here was no evidence that [the defendant] . . . was in Minnesota at the time."  *Id.*  "Given the government's burden of proof," the Court of Appeals found the government's response "totally inadequate."  *Id.*

Similarly in *Izydore*, 167 F.3d at 220, the Fifth Circuit found that the defendant's Rule 29 motion should have been granted on two substantive wire fraud counts, each of which charged a telephone call between the defendant and a third party.  Neither third party could testify about his location at the time of the call in which he participated, or about the defendant's location; nor could the court find other evidence in the record indicating that the calls crossed state lines.  *Id.* at 219-220.  The court therefore concluded, "there was insufficient evidence of an interstate nexus with respect to the telephone calls," requiring a reversal of the defendant's conviction.  *Id.* at 220.

Finally, in *United States* v. *Phillips*, 376 F. Supp. 2d 6, 9 (D. Mass. 2005), *aff'd sub nom United States* v. *Dwyer*, 238 Fed. Appx. 631 (1st Cir. 2007), the district court granted the defendants' motions for judgment as a matter of law on all four wire fraud counts in the case.  In so doing, the court rejected the government's contention that it did not need to prove that the calls at issue crossed state lines, but only that the calls traveled via an interstate phone system. The court found that such an interpretation conflicted with the plain language of the statute, which "extend[s] only to situations where the defendant 'transmits or causes to be transmitted by means of wire, radio or television in interstate or foreign commerce, any writings, signs, signals, pictures or sounds' for the purpose of executing an artifice or scheme to defraud."  *Id.* at 8 (citing 18 U.S.C. § 1343).

Because the government failed to prove the required interstate nexus for each of the wire

fraud counts, Mr. Tannin is entitled to a judgment of acquittal on Counts 5, 6, 7, and 9.

## II. THE GOVERNMENT FAILED TO OFFER SUFFICIENT EVIDENCE OF SCHEME LIABILITY REQUIRED TO ESTABLISH SECURITIES FRAUD UNDER SUBSECTIONS (A) AND (C) OF RULE 10B-5

The government's direct case against Mr. Tannin makes clear that this case is about

misrepresentations.  The government's evidence focused exclusively on a series of statements

Mr. Tannin between March and June 2007 that the government claims were untrue or

misleading.   Material misrepresentations are covered under subsection (b) of Securities and

Exchange Commission Rule 10b-5, which prohibits "mak[ing] any untrue statement of a material

fact or . . . omit[ing] to state a material fact necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-

5(b).

Counts 2 and 3 of the indictment charge Mr. Tannin with violations of subsection (b).

But they also charge him with violations of subsections (a) and (c).  Subsections (a) and (c) of

Rule 10b-5 prohibit an individual from engaging in a fraudulent scheme or course of business.

Specifically, they make it unlawful "[t]o employ any device, scheme, or artifice to defraud," 17

C.F.R. § 240.10b-5(a), or "[t]o engage in any act, practice or course of business which operates

or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of

any security." 17 C.F.R. § 240.10b-5(c). The three prongs of Rule 10b-5 are disjunctive. *See*

*United States* v. *Naftalin*, 441 U.S. 768, 773-74 (1978) (describing Section 17(a) of the

Securities Act of 1933 upon which Rule 10b-5 is based).

Despite having charged Mr. Tannin under all three subsections of Rule 10b-5, the

government failed to offer *any* evidence on its direct case of Mr. Tannin's participation in a

scheme to defraud, as required under subsections (a) and (c).  As a result, if Counts 2 and 3 are

7

not dismissed – we contend that they should be – the jury should be charged only as to

subsection (b), which prohibits material misstatements or omissions.

To convict a defendant under subsections (a) or (c), the government cannot rely on

misrepresentations or omissions.  Under Second Circuit precedent, the government must prove

that the defendant engaged in a scheme to defraud that included some actual conduct distinct

from a defendant's allegedly material misstatements or omissions.  In other words, the

government must establish that the defendant committed at least one deceptive act or practice,

not simply that he made a misstatement or omission.  *See Lentell* v. *Merrill Lynch & Co. Inc.*,

396 F.3d 161, 177 (2d Cir. 2005) (rejecting scheme liability claims "where the sole basis for

such claims is alleged misrepresentations or omissions"); *United States* v. *Bongiorno,* No. 05 Cr.

390, 2006 WL 1140864, at *5 (S.D.N.Y. May 1, 2006) ("The keystone required for a jury to

convict a defendant pursuant to subsections (a) or (c) of Rule 10b-5 is a finding of a fraudulent

scheme or course of business"); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 476 (S.D.N.Y.

2005) (rejecting scheme liability claim where complaint "fail[ed] to allege that there was a

scheme to defraud that went beyond the misrepresentations themselves").

A "deceptive" act is one that "'tend[s] to deceive' or 'ha[s] power to mislead'" and "[t]o

deceive means to 'take unawares esp[ecially] by craft or trickery . . . to deprive esp[ecially] by

fraud or stealth.'" *Bongiorno*, 2006 WL 1140864, at *7 (quoting *Webster's Third New Int'l*

*Dictionary* at 585, 584).  Proof of a deceptive act thus requires "at a minimum . . . an act that

gives the victims a false impression."  *SEC* v. *Lucent Technologies, Inc.*, 610 F. Supp. 2d 342,

360 (D.N.J. 2009); *see also United States* v. *Finnerty*, 474 F. Supp. 2d 530, 539-40 (S.D.N.Y.

2007) (failure to prove deception where there was no evidence that customers were actually

deceived by defendant's actions).

Because of the requirement of a deceptive act, typical scheme liability cases brought under subsections (a) and (c) involve sham transactions, interpositioning trades, or market manipulation.[1]  A defendant's misstatements and omissions may constitute some evidence of a scheme to defraud.  But where, as here, the government's allegations of scheme liability rest entirely on the same statements that form the basis of a misrepresentation claim under subsection (b), there is no violation of subsections (a) and (c).  *See United States* v. *Treacy*, No. S2 08 Cr. 0366, 2008 WL 4934051, at *3 (S.D.N.Y. Nov. 19, 2008) ("For liability to arise under both subsection (b) and subsections (a) and (c) under Rule 10b-5, it must not only be alleged that Treacy made misrepresentations, but also that he undertook a deceptive scheme or course of conduct distinct from those misrepresentations.  Claims of misrepresentation may not be cast as claims under Rule 10b-5(a) and (c).");  *TCS Capital Mgmt., LLC* v. *Apax Partners, L.P.*, No. 06 Civ. 13447, 2008 WL 650385, at *22 (S.D.N.Y. Mar. 7, 2008) (rejecting scheme liability where the alleged "deception in this case arose from the failure to disclose the 'real terms' of the deal, which is nothing more than a reiteration of the misrepresentations and omissions that underlie plaintiffs' disclosure claim");  *SEC* v. *KPMG LLP*, 412 F. Supp. 2d 349, 378 (S.D.N.Y. 2006)

---

[1]    *See, e.g.*, *SEC* v. *Simpson Capital Mgmt., Inc.*, 586 F. Supp. 2d 196, 208 (S.D.N.Y. 2008) (allowing scheme claim where defendants were alleged to have engaged in a scheme to "late trade" mutual funds); *SEC* v. *Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 494 (S.D.N.Y. 2007) (allowing scheme claim where defendant, CFO of car parts producer, was alleged to have assisted in perpetrating fraudulent "round-trip [financial] transactions" supported by fabricated documentation); *United States* v. *Hunt*, No. 05 Cr. 395, 2006 WL 2613754, at *4 (S.D.N.Y. Sept. 6, 2006) (indictment properly alleged violations of subsections (a) and (c) where defendant, a "specialist" trader, was accused of trading ahead and interpositioning orders in between executable customer orders); *Bongiorno*, 2006 WL 1140864, at *7 (indictment properly alleged violations of subsections (a) and (c) where defendants, "specialist" traders, were alleged to have traded for their own accounts to profit at the expense of existing public orders); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004) (denying motion to dismiss scheme claim where it was alleged that defendant  auditor "masterminded" sham swap transactions used to circumvent GAAP and inflate telecommunication's company's revenues). *Cf.  Finnerty*, 474 F. Supp. 2d at 542 (motion for new trial granted because government failed to establish that interpositioning was a deceptive act through evidence of customer expectations).

("Because the core misconduct alleged is in fact a misstatement, it would be improper to impose primary liability on Yoho by designating the alleged fraud a 'manipulative device' rather than a 'misstatement.'"); *see also In re Royal Dutch/Shell Transport Sec. Litig.*, No. 04 Civ. 374, 2006 WL 2355402, at *9 (D.N.J. 2006) (rejecting scheme liability where "such allegations [were] nothing more than a Rule 10b-5(b) fraudulent misrepresentation claim . . . which may not be recast as a Rule 10b-5(a) or (c) claim").

In *United States* v. *Treacy*, for instance, the defendant was charged, in part, with securities fraud and conspiracy to commit securities fraud for failing to record and report compensation expenses of option grants.  The defendant moved to dismiss portions of the indictment, alleging violations of Rule 10b-5(a) and (c).  He argued that because the indictment did not allege any illegal conduct beyond certain specified misrepresentations, the government failed to state an offense under subsections (a) and (c) as a matter of law.  *Treacy*, 2008 WL 4934051, at *3.  The court agreed that the government must allege some deceptive conduct in order to survive a motion to dismiss.  *Id.*  But the court went on to find that the defendant's alleged backdating of grants to obtain lower-priced stock options encompassed potentially deceptive acts and constituted "conduct" sufficient for the claims to proceed under subsections (a) and (c).  *Id.* at *4.

Here, unlike *Treacy*, the government failed to offer any evidence of a deceptive act by Mr. Tannin beyond his alleged misrepresentations.  To the contrary, during its case-in-chief, the fraudulent conduct the government sought to establish consisted only of an aggregation of Mr. Tannin's alleged misstatements.  The government's strategy at trial mirrored the indictment, which alleges that both defendants executed their scheme to defraud *by making* misrepresentations and omitting material facts.  (*See* Ind. ¶ 25.)  ( "In executing their scheme [to

defraud], as detailed below, CIOFFI and TANNIN, together with others, misrepresented or omitted material facts in communications with investors and lenders about a variety of topics, including . . . .").

Because the government introduced evidence of only alleged misrepresentations and omissions, no rational trier of fact could find the essential elements of securities fraud under subsections (a) or (c). As a result, if Counts 2 and 3 are sent to the jury, which we contend they should not be, they should be presented only under subsection (b). Allowing the jury to decide which theory of liability best applies would constitute trial error and would pose a serious risk of reversal on appeal. "[W]here a jury returns a general verdict of guilt that might rest on multiple legal theories, at least one insufficient in law and the others sufficient, the verdict must be set aside." *United States* v. *Skilling*, 554 F.3d 529, 542 (5th Cir. 2009) (citing *Yates* v. *United States*, 354 U.S. 298, 312 (1957) (conviction overturned where defendant was charged with a two-object conspiracy, and one of the objects was time-barred)).

## III.   THE GOVERNMENT FAILED TO ESTABLISH THAT MR. TANNIN MADE A MATERIAL MISREPRESENTATION IN CONNECTION WITH THE PURCHASE OR SALE OF A SECURITY

To sustain a conviction for securities fraud based on misrepresentations, the government must prove that Mr. Tannin made at least one untrue statement or misleading omission of material fact in connection with the purchase or sale of a security and that an investor in the Funds reasonably and justifiably relied on that statement or omission of material fact in purchasing or selling an interest in the Funds. *See* 15 U.S.C. § 78j(b); *Basic Inc.* v. *Levinson*, 485 U.S. 224, 231-32 (1988); *United States* v. *Schlisser*, 168 Fed. Appx. 483, 486 (2d Cir. 2006) (actual reliance likely should be a required element of criminal securities fraud because "[w]hile the securities fraud statute speaks only in terms of 'material[ity],' the very same statutory

11

language has been interpreted in the civil context to require actual reliance.") (citing *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336 (2005)).

In its case-in-chief, the government introduced three general categories of alleged misrepresentations by Mr. Tannin:

(1)     statements regarding Mr. Tannin's intention to increase his personal investment in the Funds;

(2)     forward-looking statements of optimism about the future performance of the mortgage-market and the Funds; and

(3)     statements regarding the level of redemptions from the Funds.

None of these alleged misrepresentations can be used as evidence to support a conviction for securities fraud.  Mr. Tannin's statements regarding his intention to add money to the Funds were true when made, and he had no duty to update investors as circumstances changed.  Mr. Tannin's forward-looking statements of optimism regarding the future of the Funds were reasonable at the time and immaterial as a matter of law.  And the government failed to present sufficient evidence that Mr. Tannin's statements regarding the level of redemptions were untrue statements of material fact.  The government likewise failed to present sufficient evidence that an investor reasonably and justifiably relied on Mr. Tannin's alleged misstatements in connection with a purchase or sale of interests in the Funds.

Mr. Tannin is thus entitled to a judgment of acquittal on the securities fraud counts.

## A.     Mr. Tannin's Statements Regarding His Personal Investment in the Funds Were True When Made

During its direct case, the government introduced several statements Mr. Tannin made in March 2007 that he intended to add money to the Funds that month.  The government contends that Mr. Tannin never really intended to increase his personal investment and that he was lying when he said he would.

To sustain a conviction for securities fraud based on statements of present intent, the government must establish that the statements were false when made.  The government cannot meet its burden merely by showing an ultimate failure to perform.  It must establish that Mr. Tannin secretly intended not to perform or knew that he could not perform when he said he would.  Moreover, unless the non-performance is coupled with other facts probative of the intent not to perform, no fraudulent intent may be inferred.  *See ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007) (failure to carry out a promise does not constitute Section 10(b) fraud "unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform"); *Mills* v. *Polar Molecular Corp*, 12 F.3d 1170, 1176 (2d Cir. 1993) (no fraudulent intent where company made a number of contracts to register shares but never performed on any of them); *Luce* v. *Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (failure to carry out a promise does not constitute fraud if the promise was made in good faith).

The government introduced no evidence that Mr. Tannin's statements about increasing his personal investment were false when made.  To the contrary, all evidence suggests that Mr. Tannin's statements were true expressions of his desire and intention at the time.  Mr. Tannin did not tell investors one thing and his colleagues another.  Rather, he made the same statements about adding money to his colleagues—including his co-defendant and alleged co-conspirator, Mr. Cioffi—as he did to investors.  On March 7, 2009, for instance, Mr. Tannin told Mr. Cioffi he was "thinking about adding to EL as well."  (GX 12.)  Three weeks later, on March 30, 2007, he told fund colleague Steven Van Solkema the same thing, explaining, "[b]elieve it or not—I've been able to convince people to add more money—which I am doing as well . . . . "  (GX 45.) Moreover, the evidence overwhelmingly established that Mr. Tannin was extremely bullish

during the short period in March when he told investors that he was planning to add money, and the government introduced no genuine evidence to the contrary.

Given the consistency between Mr. Tannin's statements to investors and his colleagues at the Funds, there is no basis upon which a rational trier of fact could conclude beyond a reasonable doubt that Mr. Tannin's statements regarding his personal investments were false when made.

Mr. Tannin also had no duty to update his statements about his personal investments when circumstances changed because his statements were not material. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (duty to update arises where subsequent events render prior statement misleading if undisclosed information is material). A material fact is one that would have been significant to a reasonable hedge fund investor in making a decision whether to invest or redeem an interest in the Funds. *See Basic Inc.,* 485 U.S. at 240. An alleged omission or misrepresentation is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (quoting *TSC Indus., Inc.* v. *Northway, Inc.*, 426 U.S. 438, 449 (1976)) (securities fraud). There is no bright-line test for materiality. *See Basic Inc.*, 485 U.S. at 236. Instead, materiality "necessarily depends on all relevant circumstances of the particular case." *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).[2]

---

[2]     Materiality is a mixed question of law and fact, appropriately decided in the first instance as a matter of law. *See, e.g., Nadoff* v. *Duane Reade, Inc.*, 107 Fed. Appx. 250, 253 (2d Cir. 2004) (affirming district court's dismissal of the case in its entirety based in part on a finding that defendant's statements were immaterial as a matter of law); *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 109 (2d Cir. 1998) (affirming district court's grant of summary judgment based in part on a finding that defendant's statements were immaterial as a matter of law); *Lasker* v. *N.Y. State*

Here, none of Mr. Tannin's statements about increasing his personal investments was sufficiently concrete or specific to induce reliance.  One investor readily acknowledged Mr. Tannin's statements had no significant impact on the "total mix of information," explaining, "We didn't add any money because we wouldn't have added just on the basis of that recommendation."  (Tr. at 511-12 (K. Chavanne).)  In addition, although the fact of Mr. Tannin's investment in the Funds may have been important to some investors, the precise amount he had invested was not.  Multiple investors testified that they never knew the specific amount of money Mr. Tannin had invested in the Funds, nor did they ever bother to ask.  (*See, e.g.,* Tr. at 478-79 (K. Chavanne); Tr. at 684 (B. Borg-Brenner).)  Some acknowledged they were not even entitled to that information.  (Tr. at 564 (K. Chavanne).)  In fact, it was Bear Stearns' policy not to disclose the specific amounts that portfolio managers had invested in the Funds.  (Tr. at 1681, 1759 (E. Kerr).)

Because the government failed to establish that Mr. Tannin's statements about his personal investments were false when made, they cannot be considered as independent evidence sufficient to support a conviction for securities fraud under Counts 2 and 3.

### B.    Mr. Tannin's Forward-Looking Statements of Optimism Were Immaterial as a Matter of Law and Cannot Support a Conviction for Securities Fraud

Among the evidence introduced by the government were various statements made by Mr. Tannin in March and April 2007, expressing optimism about the Funds' financial position and prospects. Examples of these statements include:

- Mr. Tannin's March 6, 2007 email to investor Klaus Chavanne:  "We are very excited and comfortable with our performance.  There was a lot of volatility in February.  Our hedges and funding relationships worked as we

---

*Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (affirming district court's dismissal of the case in its entirety based on a finding that defendant's statements were immaterial as a matter of law).

had planned . . . We are in a great position.  I think you guys should add some money here for April 1st.  We are seeing a lot of very good opportunities. . . . "  (GX 13.)

- Mr. Tannin's March 15, 2007 email to M. Mitchell and Gregory Quental: "There is really nothing more important to us right now. We believe this is a great opportunity. There are risks, absolutely so – but the bet to make at this point is whether the sub-prime securitization market will implode and create ratings volatility in the Triple A and Double A assets we own. Our view is NO.  And this is the time to express it. . . . "  (GX 25.)

The government contends that these statements misrepresented the true health of the Funds and that Mr. Tannin intentionally engaged in such misrepresentations.  But these forward-looking optimistic statements were immaterial as a matter of law and Mr. Tannin had no duty to disclose internal fund deliberations.

### 1.    Mr. Tannin's optimistic statements were immaterial as a matter of law

Mr. Tannin's statements about the future of the mortgage market and the Funds were nothing more than commonplace business pitches and vague expressions of hope for the Funds' success.  They lacked specificity and precision and were worded as opinions rather than guarantees.  No reasonable hedge fund investor would have relied on them in deciding whether to purchase or redeem interests in the Funds.  Accordingly, under controlling Second Circuit precedent, these statements are immaterial as a matter of law.

The Second Circuit has repeatedly held that expressions of puffery and corporate optimism, such as those Mr. Tannin made, are immaterial.[3]  This makes sense because as the Court of Appeals in *United States* v. *Coffman*, 94 F.3d 330, 334 (7th Cir. 1996), has explained:

---

[3]    *See ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 205-6 (2d Cir. 2009) (statements that company's "risk management processes are highly disciplined and designed to preserve the integrity of the risk management process;" that the company "set the standard for integrity;" and that it would "continue to reposition and strengthen [its] franchises with a focus on financial discipline" constitute inactionable puffery); *Nadoff*, 17 Fed. Appx. at 252 (puffery and corporate optimism do not give rise to securities

> Almost all sellers engage in a certain amount of puffing; all buyers, even
> those who are rather gullible, know this; it would not do to criminalize
> business conduct that is customary rather than exceptional and is relatively
> harmless.  The cases carve a safe harbor for the type of misrepresentation
> that, being so commonplace as to be 'normal,' is not likely to fool anyone.

Mr. Tannin's statements fit within this safe harbor, especially in light of his role as marketer for the Funds.  Mr. Tannin's job was to raise investor capital, and any reasonable hedge fund investor would expect some amount of puffing and sales talk on his part.

Moreover, Mr. Tannin's statements were worded as opinions rather than guarantees. Second Circuit law clearly distinguishes between a company's positive predictions about the future and its specific promises of success.  The defendants in *In re IBM Corp. Securities Litigation* made various statements regarding the company's plans to continue payment of a dividend, such as "obviously the dividend is safe" and "we're not—despite your anxiety— concerned about being able to cover the dividend for quite a foreseeable time."  163 F.3d at 105. Two months later, IBM announced it was "unsure of its ability to maintain the dividend at current levels," and stock prices fell.  *Id.* at 106.  The Second Circuit rejected plaintiffs' claims of securities fraud, concluding "that the challenged statements [were], as a matter of law, opinions and not guarantees."  *Id.* at 107.  The Court explained:  "IBM's management lacked the actual or apparent authority to guarantee the dividend, and it would be unreasonable for the market to have interpreted the statements at issue as anything other than an individual's prediction about the future."  *Id.; see also In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 558 (S.D.N.Y. 2004) (statements inactionable because they "expresse[d] personal optimism about regulatory events not under the Company's control," and any reasonable investor would

---

violations) (citation omitted); *Lasker*, 85 F.3d at 59 (statements that company was "commit[ed] to create earnings opportunities" and that company's "business strategies [would] lead to continued prosperity" constitute inactionable puffery); *San Leandro Emergency Med. Group Profit Sharing Plan* v. *Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (same).

understand that); *Elliot Assocs., L.P.* v. *Covance, Inc.*, No. 00 Civ. 4115, 2000 WL 1752848, at *9 (S.D.N.Y. Nov. 28, 2000) ("Given the usual level of uncertainty as to whether any proposed merger will actually be completed," company's statements "could not possibly be understood as anything but opinions").

Here, as in *IBM*, Mr. Tannin lacked the actual or apparent ability to control the market for mortgage-backed securities, and no reasonable hedge fund investor would interpret his confidence in the Funds' "possibilities" and "opportunities" as anything other than his own individual predictions about the future. Moreover, given the obvious volatility in the mortgage market in March 2007, any reasonable investor in mortgage-backed securities would recognize that a fund with "great possibilities" and "prudent opportunity" could quickly be transformed by unforeseen events into a fund with few possibilities and little opportunity or none at all. *See Elliot Assocs.*, 2000 WL 1752848, at *10 (defendants' statement that the merger was "on track" not sufficiently concrete or specific to impose a duty to update because "[i]f something is 'on track' it is reasonable to assume that it could go 'off track'"). In fact, pointing out the Funds' "opportunities" or "possibilities" in a down market merely invokes the old adage – "buy low, sell high" – which is "such common knowledge that a reasonable investor can be presumed to understand" it already. *Parnes* v. *Gateway*, 122 F.3d 539, 547 (8th Cir. 1997).

Mr. Tannin's statements were also tempered by appropriate cautionary language. For instance, in his March 15, 2007 email quoted above, Mr. Tannin qualified his statements by cautioning, "There are risks, absolutely so." (GX 25.) Given Mr. Tannin's cautionary language regarding the obvious existence of risk, and his description of his position as "our view" and a "bet," no reasonable hedge fund investor would have interpreted this statement as a guarantee. Nor would a reasonable hedge fund investor rely on the statement in deciding whether to invest

in the Funds.  *See In re IBM*, 163 F.3d at 109 ("no reasonable investor would rely on this

discussion given the cautious language and qualifying terminology."); *Nadoff*, 107 Fed. Appx. at

252 (expressions of puffery and corporate optimism not actionable, especially when

accompanied by adequate cautionary language and not stated as guarantees).

Finally, given their net worth, knowledge, and experience,[4] the Funds' investors were

well-equipped to evaluate investment risk and better able even than the ordinary investor in a

publicly-traded stock to recognize Mr. Tannin's statements as puffery, the same sort of sales talk

commonly heard throughout the corporate world.  *See, e.g., Edison Fund* v. *Cogent Inv.

Strategies Fund*, 551 F. Supp. 2d 210, 224 (S.D.N.Y. 2008) (taking into account sophisticated

nature of the investors in evaluating materiality:  "The Non-Leveraged Fund was clearly for

sophisticated buyers only and carried high risk-in particular the risk that redemptions would not

be readily available on demand").

The Court should thus find Mr. Tannin's forward-looking statements immaterial as a

matter of law and insufficient to constitute independent evidence to support a conviction for

securities fraud under Counts 2 and 3.

---

[4]     The Funds sold only to "qualified purchasers."  *See Confidential Private Placement
Memorandum*, Bear Stearns High-Grade Structured Credit Strategies, L.P., Summary of
Principal Terms, at 5 (DX 1969); *Confidential Private Placement Memorandum*, Bear Stearns
High-Grade Structured Credit Strategies Enhanced Leverage Fund, Summary of Principal Terms,
at 6 (DX 1365).  "Qualified purchasers" are defined under the Investment Company Act ("ICA")
as individual investors owning at least $5 million in investments or individual investors, acting
for their own account or the accounts of others, who in the aggregate own and manage at least
$25 million on a discretionary basis.  *See* 15 U.S.C. § 80a-2(a)(51).  The qualified purchaser
exclusion from the ICA reflects Congress' view that these investors are "highly sophisticated
shareholders" who "appreciate the risks associated with investment pools that do not have the
Investment Company Act's protections."  S. REP. NO. 104-293 (1996), as reprinted at 1996 WL
367191, at *10.

## 2.     Mr. Tannin had no duty to disclose internal deliberations of the Funds

The government has suggested that despite these forward-looking statements of optimism to the Funds' investors, at some point, Mr. Tannin and members of the fund team had discussions about consolidating the Funds or closing them, and that Mr. Tannin had an obligation to disclose these internal deliberations to investors.[5]

But the Second Circuit has determined that entities are "not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d at 267. Rather, "an omission is actionable under the securities law only when the corporation is subject to a duty to disclose the omitted facts." *Id.* Here, the government has identified no rule, regulation, or principle that would require a hedge fund to disclose such internal deliberations. This is not surprising because courts have repeatedly held that even public companies, which unlike hedge funds are subject to extensive disclosure obligations, are not required to disclose all internal corporate matters. In *San Leandro*, 75 F.3d 801, for example, Philip Morris made numerous public statements regarding its pricing and marketing plan, including representations that it was committed to a strategy of increased prices to sustain profits and optimistic about its earnings. However, the company's board thereafter approved a plan to reduce the price of Marlboros, and the stock dropped 25% on the news. Phillip Morris was accused of securities fraud because it failed to disclose that at the time it made the statements of its marketing strategies it was actively considering and testing an alternative (and opposite) strategy – to sacrifice profits in favor of market share. The Second

---

[5]     A legal duty to speak may arise when one party has information that the other party is entitled to know because of a fiduciary relationship or other similar relationship of trust and confidence. *See United States* v. *Chestman*, 947 F.2d 551, 568 (2d Cir. 1991). As discussed in Section IV below, Mr. Tannin had no fiduciary relationship with the individual fund investors.

Circuit concluded that Phillip Morris was under no obligation to disclose its internal alternative marketing strategies. *San Leandro*, 75 F.3d at 811. *See also In re Northern Telecom Ltd. Sec. Lit.*, 116 F. Supp. 2d 446, 459 (S.D.N.Y. 2000) ("Plaintiffs cite no case in which a company has been held to be generally obligated to disclose internal problems merely because those problems were potentially significant. Indeed courts generally do not impose a duty to disclose in such circumstances.") (citing cases). If a public corporation is not required to disclose such internal deliberations, hedge fund managers cannot have a duty to make similar disclosures.

The government has thus failed to prove that Mr. Tannin had a duty to disclose internal deliberations about the state of the Funds or future plans, and any failure to do so cannot form the basis of a conviction under the securities fraud charges.

### C.     The Government Failed to Present Sufficient Evidence that Mr. Tannin's Statements Regarding Redemptions Were Untrue Statements of Material Fact

During its direct case, the government introduced statements that Mr. Tannin made in early May 2007 that there were no large redemptions. But the government failed to establish beyond a reasonable doubt that Mr. Tannin's statements were untrue statements of material fact.

John Bowden, a representative of a third-party lender to the Funds, testified that he had a conversation with Mr. Tannin in early May 2007 in which Mr. Tannin said that there were no large redemptions. But Mr. Bowden had no handwritten notes and struggled with his recollection based on what he did have. (Tr. at 1967-75.)

Shelley Bergman, a Bear Stearns broker, claimed that at a meeting that took place in May 2007 (Tr. at 2088), during which he was told that there were only "a couple of million" dollars in redemptions from the Funds. (Tr. at 2038.) But what is clear is that Mr. Bergman's team knew by May 10 that there had been $200 million in redemptions in the Enhanced Fund. (GX 75a.) Moreover, the evidence suggests that Mr. Bergman never told his customers about the $200

21

million in redemptions.  Any statement about redemptions at the May meeting therefore would have no connection to any purchase or sale of an interest in the Funds.

Mr. Tannin's alleged statements regarding the level of redemptions thus cannot form the basis of a conviction for securities fraud.

### D. The Government Failed to Present Sufficient Evidence That an Investor Reasonably Relied on Any Alleged Misstatement or Misleading Omission in Connection with a Purchase or Sale

#### 1. Insufficient Evidence of a Purchase or Sale

To establish the crime of securities fraud, the government must offer sufficient evidence to convince a rational juror that the defendant's misrepresentation was "in connection with the purchase or sale of a security."  *See* 15 U.S.C. § 78j(b) (Section 10(b)); 17 C.F.R. § 240.10b-5 (Rule 10b-5).

The term "in connection with" has been interpreted flexibly to mean "coincid[ing] with," "touch[ing] upon," or having "some nexus" to a securities transaction.  *SEC* v. *Zanford*, 535 U.S. 813, 825 (2002) (broker's alleged conduct of selling customers' securities with intent to misappropriate the proceeds "coincid[ed]" with securities transactions and, thus, constituted fraud "in connection with" the purchase or sale of a security); *SEC* v. *Stanard*, No. 06 Civ. 7736, 2009 WL 196023, at *27 (S.D.N.Y. Jan. 27, 2009) (fraud is conducted "in connection with" a securities transaction "if it somehow 'touches upon' or has 'some nexus' with 'any securities transaction.'") (citation omitted).  *See also Leykin* v. *AT&T Corp.*, 423 F. Supp. 2d 229, 241 (S.D.N.Y. 2006), *aff'd*, 216 Fed. Appx. 14 (2d Cir. 2007) ("[T]he fraud itself must be 'integral to the purchase and sale of the securities in question.' Conduct that is merely incidental or tangentially related to the sale of the securities will not meet the 'in connection' requirement.").

The "purchase or sale" requirement is more restrictive.  As the plain language of the statute indicates, to satisfy that requirement, there must be evidence of an actual purchase or sale.

Evidence that investors were fraudulently induced to *hold* their securities is insufficient.  *See,*
*e.g., Kelter* v. *Apex Equity Options Fund, L.P.*, No. 08 Civ. 2911, 2009 WL 2599607, at *9
(S.D.N.Y. Aug. 24, 2009) ("[I]t is clear in this Circuit that 'the requirement of fraud in
connection with the purchase or sale of a security is not satisfied by an allegation that plaintiffs
were induced fraudulently not to sell their securities.'") (quoting *Abrahamson* v. *Fleschner*, 568
F.2d 862, 868 (2d Cir. 1977)); *SEC* v. *Northshore Asset Mgmt.*, No. 05 Civ. 2192, 2008 WL
1968299, at *8 (S.D.N.Y. May 5, 2008) (evidence that an investor was convinced to redeem just
75%, rather than 100%, of its investment was "insufficient to demonstrate the 'in connection
with a purchase or sale' requirement").  *See also Pension Comm. of the Univ. of Montreal*
*Pension Plan* v. *Banc of America Securities, LLC*, 592 F. Supp. 2d 608 (S.D.N.Y. 2009)
(distinguishing common law fraud under New York law from Rule 10b-5 claims by explaining
that, under New York law, there is no purchase or sale requirement, thus "a claim for common
law fraud is available to investors who retain their securities in reliance on a defendant's
misrepresentations") (citation and internal quotation marks omitted).  Evidence that a
misrepresentation occurred *following* a purchase or sale is also inadequate.  *See, e.g., Kelter*,
2009 WL 2599607, at *9 (alleged misstatements made after plaintiff's purchase did not provide
basis for securities fraud charge); *Chien* v. *Skystar Bio Pharmaceutical Co.*, 566 F. Supp. 2d 108,
118 n.9 (D. Conn. 2008) (alleged misstatements made following plaintiff's purchase could not
have induced him to make the purchase in the first place).

Here, the government failed to produce sufficient evidence of a purchase or sale in
connection with Mr. Tannin's alleged misstatements.  The government elicited evidence that
some investors may been induced to *hold* their interests based on the alleged misstatements made
by Mr. Tannin.  The government also elicited evidence that investors decided to redeem their

interests, in whole or in part, but those decisions were made *in spite of* (or, in some cases, *in ignorance of*) Mr. Tannin's alleged misrepresentations, rather than "in connection with" his supposed misstatements.  This evidence is insufficient to establish the "in connection with a purchase or sale" requirements of Section 10(b).  *See Kelter*, 2009 WL 2599607, at *9; *Northshore Asset Management*, 2008 WL 1968299, at *8.

### 2.     Insufficient Evidence of Justifiable Reliance

In *United States* v. *Schlisser*, 168 Fed. Appx. 483, the Second Circuit recognized that proof of actual reliance by an investor on a defendant's alleged misrepresentations likely should be an essential element of criminal securities fraud.  The Court explained, "While the securities fraud statute speaks only in terms of 'material[ity]' . . ., the very same language has been interpreted in the civil context to require actual reliance."  *Id.* at 486 (citing *Dura Pharmaceuticals, Inc.* v. *Broudo*,  544 U.S. 336, 341-42 (2005)) (alteration in *Schlisser*).   Given that courts typically interpret liability *more* narrowly in the criminal context, the Court could see no reason why a greater showing for civil liability would be required than for criminal liability. *Id.*; *see also United States* v. *Santos*, 128 S. Ct. 2020, 2025 (2008) ("The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.").

To determine whether an investor has reasonably and justifiably relied on an alleged misrepresentation, courts "consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them."  *Emergent Capital In*v. *Mgmt. LLC* v. *Stonepath Group, Inc.*, 343 F.3d 189, 195 (2d Cir. 2003).  "An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth."  *Starr* v. *Georgeson Shareholder, Inc.*, 412 F.3d 103, 109 (2d Cir. 2005) (quoting *Brown* v. *E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993)).

The government offered insufficient evidence that any investor justifiably relied upon any alleged misrepresentation or misleading omission made by Mr. Tannin in making a purchase or sale of an interest in the Funds.

\* \* \* \* \* \*

In short, the government failed to present sufficient evidence from which a reasonable juror could find beyond a reasonable doubt that Mr. Tannin made a material misrepresentation or misleading omission upon which an investor justifiably relied in making a purchase or sale of an interest in the Funds.  A judgment of acquittal should be entered on Counts 2 and 3.

## IV.   MR. TANNIN'S ALLEGED OMISSIONS CANNOT SUPPORT A CONVICTION FOR SECURITIES FRAUD BECAUSE THE GOVERNMENT FAILED TO ESTABLISH THAT HE OWED A FIDUCIARY DUTY TO THE INDIVIDUAL FUND INVESTORS

The omission of a material fact does not constitute a fraudulent act for purposes of the securities fraud statute unless the defendant has a legal duty to speak.  *Chiarella* v. *United States*, 445 U.S. 222, 235 (1980) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak").  A legal duty to speak arises only when one party has information that the other party is entitled to know because of a fiduciary relationship or other similar relationship of trust and confidence.  *See United States* v. *Chestman*, 947 F.2d 551, 568 (2d Cir. 1991).

Mr. Tannin had no fiduciary duty to the individual fund investors.  Hedge fund managers' fiduciary duties run only to the funds they manage, not to the funds' investors.  *See Goldstein* v. *SEC*, 451 F.3d 873, 880 (D.C. Cir. 2006) (in a hedge fund, a "direct relationship exists between the adviser and the fund, but not between the adviser and the investors in the fund.  The adviser is concerned with the fund's performance, not with each investor's financial condition").  As a

matter of law, then, Mr. Tannin cannot be convicted for what he allegedly failed to tell investors, but only for specific misstatements of material fact.

The government contends that particular factual circumstances might sometimes serve to create an implied fiduciary relationship, even in the absence of an express fiduciary agreement. However, as *Goldstein* makes clear, finding an implied fiduciary relationship between hedge fund managers and their investors would create a serious conflict of interest:

> If the investors are owed a fiduciary duty and the entity is also owed a fiduciary duty, then the adviser will inevitably face conflicts of interest. Consider an investment adviser to a hedge fund that is about to go bankrupt. His advice to the fund will likely include any and all measures to remain solvent. His advice to an investor in the fund, however, would likely be to sell. For the same reason, we do not ordinarily deem the shareholder in a corporation the "clients" of the corporation's lawyers or accountants. While the shareholders may benefit from the professionals' counsel indirectly, their individual interests easily can be drawn into conflict with the interests of the entity. It simply cannot be the case that investment advisers are the servants of two masters in this way.

*Goldstein*, 451 F.3d at 881. The government cannot amend the law to impose new legal duties on criminal defendants, especially ones that conflict with obligations that already exist.

The sole case upon which the government relies for the proposition that hedge fund managers may owe a fiduciary duty to investors is *United States* v. *Lay*, 556 F. Supp. 2d 652 (N.D. Ohio 2008). But that case does not stand for the general proposition that a hedge fund manager owes a fiduciary duty to a fund's investors. Rather, there, a district judge in the Northern District of Ohio found that specific relationship characteristics between a hedge fund manager and the sole investor in a hedge fund created an exception to the general rule set forth in *Goldstein* that a hedge fund manager owes no fiduciary duty to investors. The court explained, "In this case, unlike *Goldstein*, there is evidence of relationship characteristics between the OBWC (investor) and Lay with respect to the Long/core fund investments in the ADF that could be found by a reasonable jury to make a client and/or fiduciary relationship. . . ." *Id.* at 671. For

instance, there was "no dispute" that OBWC had a "pre-existing fiduciary relationship separate and apart" with Lay concerning its investment in the hedge fund and OBWC was the *only investor* in the fund.  *Id.* at 670.  Moreover, in a related civil case, Lay had repeatedly testified that the investor, not the hedge fund, was his client.  *Id.* at 668 n.54.

As the Second Circuit has instructed, "At the heart of the fiduciary relationship lies reliance, and de facto control and dominance."  *Chestman*, 947 F.2d at 568.  One may act "in a fiduciary capacity when the business with which he or she transacts, or the money or property which he or she handles, is not his or her own or for his or her own benefit, but for the benefit of another person, as to whom he or she stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part."  *United States* v. *Szur*, 289 F.3d 200, 210 (2d Cir. 2002).  But not every relationship that involves handling another's money or property is a fiduciary one.  A fiduciary relationship is "personal and context-specific."  *DeBlasio* v. *Merrill Lynch & Co.*, No. 07 Civ. 318, 2009 WL 2242605, at *29 (S.D.N.Y. July 27, 2009).  In the hedge fund context, it would require direct and frequent contact between hedge fund managers and their investors and the provision of "personalized advice attuned to [investors'] concerns" regarding their investment decisions.  *Goldstein*, 451 F.3d at 880 ("Persons engaged in the investment advisory profession 'provide personalized advice attuned to a client's concerns.'") (quoting *Lowe* v. *SEC*, 472 U.S. 181, 208 (1985)).  The provision of general information regarding a fund's performance – as opposed to specific information tailored to an individual investor's financial condition – is therefore insufficient to establish a fiduciary relationship.

The evidence elicited confirms that Mr. Tannin did not have a fiduciary relationship with the individual fund investors.  Here, unlike in *Lay*, the Funds each had multiple investors, each of

whom had their own independent financial advisors.  Mr. Tannin did not provide individualized advice to investors based on their financial situation or investment objectives.  Nor was Mr. Tannin's relationship with investors one of "reliance, and de facto control and dominance."  To the contrary, the Funds' investors were among the most sophisticated members of the investing public.  (*See, e.g.,* Tr. at 1172 ("Fix was the most sophisticated investor that I had of many sophisticated investors" (G. Buxton).)  They had their own independent views of the markets and of hedge funds in general, and their own investment strategies.  (Tr. at 1795 (E. Kerr).)  In short, they were quite capable of analyzing risk on their own.  Because Mr. Tannin did not have a fiduciary relationship with the individual fund investors, his disclosure obligations were limited to those set forth in the contractual documents governing the relationship between the Funds and the Funds' investors.

Mr. Tannin's alleged omissions thus cannot constitute a basis for conviction under the securities fraud statute.  Nor do they allow a conspiracy conviction based on an underlying agreement to commit securities fraud.  Therefore, if the Court sends Counts 1, 2, and 3 to the jury, the jury should be instructed *not* to consider Mr. Tannin's alleged omissions as a basis for conviction.

## V.      THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE TO PROVE MATERIAL MISREPRESENTATIONS IN FURTHERANCE OF A SCHEME TO DEFRAUD INVESTORS

Counts 5, 6, 7, and 9 charge Mr. Cioffi and Mr. Tannin with wire fraud based on an alleged scheme to defraud the Funds' investors for the purpose of obtaining money or property from them by materially false and fraudulent pretenses, representations, or promises.  The government failed to present sufficient evidence to meet its burden of showing a materially false representation in furtherance of the alleged scheme to defraud investors as charged in the indictment.

The statements the government alleges constitute the false or fraudulent representations in furtherance of the scheme to defraud are specified in Counts 5, 6, 7, and 9.  These statements consist of forward-looking statements of optimism (Counts 5, 6), statements of present intent (Counts 6, 7), and a statement regarding the level of redemptions from the Funds (Count 9).  As discussed in Section III above, none of these statements was untrue when made and none was material.  Consequently, the government has failed to present sufficient evidence to show, as it is required, that a material misrepresentation was made in furtherance of a scheme to defraud the Funds' investors to obtain their money or property.

Mr. Tannin is entitled to a judgment of acquittal on Counts 5, 6, 7, and 9.

## VI.   A JUDGMENT OF ACQUITTAL SHOULD BE GRANTED ON COUNT 9 BECAUSE THE GOVERNMENT FAILED TO ESTABLISH THAT THE TELEPHONE CALL WAS MADE IN FURTHERANCE OF THE ALLEGED SCHEME TO DEFRAUD INVESTORS

Count 9 should be dismissed for an additional reason.  The government's theory of the wire fraud counts as charged in the indictment and presented at trial is that Mr. Tannin and Mr. Cioffi carried out a scheme to defraud the Funds' investors to obtain their money and property. Yet the wire fraud charge in Count 9 is predicated solely on evidence concerning a call between Mr. Tannin and John Bowden, one of the Funds' third-party lenders.

To support a conviction under the wire fraud statute, the government must prove that the wire was made "for the purpose of executing the scheme" to defraud.  *United States* v. *Maze*, 414 U.S. 395, 400 (1974) (citations omitted).  The relevant question is whether the wire was "even incident to an *essential* part of the scheme." *United States* v. *Altman*, 48 F.3d 96, 103 (2d Cir. 1995) (emphasis added).  Whether a transmission is sufficiently related is not a question of time or place, but of "dependence in some way of the completion of the scheme or the prevention of its detection" on the wire.  *United States* v. *Tarpol*, 561 F.2d 466, 472 (3d Cir. 1977).

The government presented no evidence that Mr. Tannin's alleged statement to Mr. Bowden was essential to the charged scheme.  Thus, no reasonable jury could conclude beyond a reasonable doubt that the charged scheme to defraud investors was furthered by Mr. Tannin's communication with Mr. Bowden.  Accordingly, the Court should grant a judgment of acquittal on Count Nine.  *See United States* v. *Lazarenko*, 564 F.3d 1026, 1037 (9th Cir. 2009) (reversing conviction on wire fraud counts as not in furtherance of the scheme charged).

## VII.   A JUDGMENT OF ACQUITTAL SHOULD BE GRANTED ON ALL COUNTS BECAUSE THE GOVERNMENT FAILED TO PROVE THAT MR. TANNIN ACTED KNOWINGLY AND WITH THE SPECIFIC INTENT TO DEFRAUD

Securities fraud and wire fraud are both specific intent crimes.  To sustain a conviction for either offense, the government must establish that the defendant acted knowingly and with a specific intent to defraud or deceive.  In addition, because Count 1 charges Mr. Cioffi and Mr. Tannin with a conspiracy to commit securities fraud and wire fraud, the government must also prove a specific intent to defraud to convict on the conspiracy charge.  *See United States* v. *Ceballos*, 340 F.3d 115, 124 (2d Cir. 2003) ("[w]here the conspiracy involves a specific-intent crime, the government [must] establish beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute") (citation and internal quotation marks omitted).  To satisfy the "specific intent to defraud" element in the wire fraud context, the government must show that the defendant participated in the alleged scheme for the purpose of financially harming the investors in the Funds with the specific intent of obtaining their money through deceit.  *See e.g., United States* v. *Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (wire fraud requires proof that the defendant had a "conscious knowing intent to defraud . . . [and] that the defendant contemplated or intended some harm to the property rights of the victim") (citation and internal quotation marks omitted).

Even if Mr. Tannin made misrepresentations of material fact – which he did not – the government has failed to offer sufficient evidence from which a rational juror could find that he acted knowingly and with the intent to deceive and harm investors in the Funds and to obtain their money.

In *United States* v. *Stewart*, 305 F. Supp. 2d 368 (S.D.N.Y. 2004), the trial court granted a judgment of acquittal on the securities fraud count where there was insufficient evidence of Martha Stewart's specific intent to deceive investors regarding her personal investment in ImClone stock.  The court dismissed the count despite its assumption that Stewart's public statements regarding the investment were materially false.  *See id.* at 378.   The court explained that, in some cases, false statements may "lend weight to an inference of an intent to deceive." *Id.*  But "to allow evidence of one essential element of a crime to make up for a dearth of evidence of another element runs dangerously close to ignoring the Second Circuit's directive that where a fact supporting an essential element is concerned, the court must be assured that inferences in the Government's favor are not only permissible, but supported by sufficient evidence." *Id.*  The court further explained the government was not required to "refute every possible hypothesis supporting a defendant's innocence." *Id.* at 377 (citation omitted).  But it was required to "do more than introduce evidence that is 'at least as consistent with innocence as with guilt.'" *Id.* (citation omitted).

Here, as in *Stewart*, the government failed to "ti[p] the balance in favor of a rational finding of criminal intent beyond a reasonable doubt." *Id.*  To the contrary, the evidence overwhelmingly established that Mr. Tannin was extremely optimistic in early spring 2007. (*See, e.g.,* DX 109, DX 279; Tr. at 1466, 1603-05 (E. Kerr).)  With the unfair benefit of hindsight, Mr. Tannin's bullishness was misplaced.  But it was a reasonably held belief at the

31

time, and one shared by others at the Funds, including surveillance expert Steven Van Solkema.
(*See, e.g.,* Tr. at 316, 411-13; DX 428.)  Global Head of Hedge Funds Gregory Quental testified
that "no one" at Bear Stearns believed in March 2007 that the Funds should be shut down (Tr. at
1562-63), and moreover that Bear Stearns agreed to increase its investment in the Funds in late
April because it maintained confidence in the Funds and Mr. Cioffi's strategy.  (Tr. at 1621.)
What Mr. Tannin and others at Bear Stearns Asset Management should have believed at the time
has no bearing on what he or they actually believed.  Poor business judgment, in other words,
does not constitute an intent to deceive. The government also presented insufficient evidence that
Mr. Tannin contemplated a transfer of money from the investors in the wire fraud counts to
himself.

      Furthermore, although the government need not prove motive to establish that Mr.
Tannin committed securities or wire fraud, the government's attempt in its opening to suggest
specific intent via motive fails as a matter of law in this case.  The government argues that Mr.
Tannin lied to investors to save his bonus and reputation.  (Tr. at 26, 27.)  But such motivation is
the type "generally possessed by hedge fund managers" and if deemed sufficient evidence of
specific intent, it "would read the scienter requirement out of the [securities fraud] statute,"
*Edison Fund*, 551 F. Supp. 2d at 227 (quoting *Kalnit* v. *Eichner*, 264 F.2d 131, 139 (2d Cir.
2001)), while rendering "mere misguided optimism . . . actionable under the securities laws."
*Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).  Courts in this Circuit have
repeatedly rejected attempts to establish civil securities fraud through evidence of a defendant's
motivation to increase his compensation, earn management fees, or boost stock price.  *See, e.g.*,
*id.* at 1130 ("To allege a motive sufficient support the inference that optimistic but erroneous
statements were fraudulently made, a plaintiff must do more than merely charge that executives

aim to prolong the benefits of the positions they hold."); *Acito* v. *Imcera Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated") (alteration in *Acito*) (citation omitted); *Edison Fund*, 551 F. Supp. 2d at 227 (desire to earn management fees common to all hedge fund managers and insufficient to allege motive to commit fraud); *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 142 (E.D.N.Y. 2008) (desire to increase compensation or stock price "omnipresent, and can as easily be a sign of simple ambition or run-of-the-mill geed as of fraud") (quoting *In re Refco Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 645 (S.D.N.Y. 2007)).  Therefore, even if the government had established that Mr. Tannin harbored such a motive – which it has not – this evidence is insufficient to establish that Mr. Tannin possessed the requisite intent to commit securities fraud.

In short, the government's evidence on intent was at least as consistent with innocence as with guilt.  As such, no rational trier of fact could find Mr. Tannin's intent to defraud beyond a reasonable doubt.  Because an intent to defraud is an essential element securities fraud and wire fraud, a judgment of acquittal should be granted on those counts.

A judgment of acquittal should also be granted on the conspiracy count because Mr. Tannin did not possess the requisite criminal intent.  This is true regardless of whether the government put forth sufficient evidence of Mr. Cioffi's individual intent to defraud.  In a two-person conspiracy, both defendants must possess the requisite criminal intent.  *See United States* v. *Samaria*, 239 F.3d 228, 234 (2d Cir. 2001) (quoting *United States* v. *Pickney*, 85 F.3d 4, 8 (2d Cir. 1996)) (for a criminal conspiracy, the government "must prove that the intended future conduct [the conspirators'] agreed upon includes all the elements of the substantive crime").

**VIII.   A JUDGMENT OF ACQUITTAL SHOULD BE GRANTED ON COUNT 1 BECAUSE THE GOVERNMENT FAILED TO PROVE A CONSPIRATORIAL AGREEMENT**

In addition to failing to present sufficient evidence of a specific intent to defraud, the

Court should enter a judgment of acquittal on Count 1 of the indictment because no rational trier

of fact could find the existence of a conspiratorial agreement.

To sustain a conviction for conspiracy, the government must establish beyond a

reasonable doubt the existence of an agreement between at least two people to achieve a specific

illegal end.  *See United States* v. *Cepeda*, 768 F.2d 1515, 1516 (2d Cir. 1985) ("[S]ince the act of

agreeing is a group act, unless at least two people commit it no one does").  Proof of an

agreement to achieve a lawful goal does not evidence a conspiratorial agreement.  Nor does

"accidentally parallel [criminal] action."  *United States* v. *Beech-Nut Nutrition Corp.*, 871 F.2d

1181, 1191 (2d Cir. 1989).  *See United States* v. *McCall*, 298 Fed. Appx. 591, 593 (9th Cir.

2008) (rational jurors could have concluded that defendant-colleagues should each be held

individually liable for their own fraudulent misconduct but acquitted of conspiracy because they

did not knowingly participate in the conspiracy of their colleagues).  Rather, the government

must prove an agreement to achieve an unlawful goal that is accomplished by illegal means.

Although a conspiratorial agreement need not be "formal or express," *United States* v.

*Amato*, 15 F.3d 230, 235 (2d Cir. 1994), and the details of the venture and the defendants'

individual roles need not be established from the outset, *see United States* v. *Ferguson*, 553

F. Supp. 2d 145, 158 (D. Conn. 2008), there must be proof beyond a reasonable doubt that the

members "agre[e] on the 'essential nature of the plan.'"  *United States* v. *Stavroulakis*, 952 F.2d

686, 690 (2d Cir. 1992) (citation omitted).

Here, the government contends that Mr. Tannin and Mr. Cioffi actively worked together

to keep the Funds afloat.  But keeping the Funds afloat was their job as fund managers, and it

was precisely what any reasonable investor would expect them to do.  Their efforts to maintain the Funds does not constitute a conspiratorial agreement to commit an unlawful act.  *See United States* v. *Ali*, 561 F. Supp. 2d 265 (E.D.N.Y. 2008) (distinguishing between an agreement to achieve a lawful goal and an agreement to commit a crime).  Here, as in *Ali*, no rational trier of fact could find that the defendants' goal of keeping the Funds afloat was illegal.

In addition, although "conspiracy by its very nature is a secretive operation," and the elements of a conspiracy may be established through circumstantial evidence, *United States* v. *Provenzano*, 615 F.2d 37, 45 (2d Cir. 1980), the defendants made little effort to keep their actions or intentions secret.  To the contrary, the evidence established that both defendants spent most of their time with their colleagues on the trading floor (Tr. at 418, 436 (S. Van Solkema)), and both actively engaged other senior executives, including Steven Van Solkema and Ray McGarrigal in their strategic plans.  Both Mr. Tannin and Mr. Cioffi regularly sought Mr. McGarrigal's advice.  He was copied on important emails and invited to strategic planning meetings.   Mr. McGarrigal was not criminally charged, and he is not considered an unindicted co-conspirator.  In fact, the government has stated repeatedly during this prosecution that there are no unindicted co-conspirators in this case.  *See, e.g.*, May 8, 2009 Letter of AUSA James McGovern to the Honorable Frederic Block ("[A]s of the date of this letter, the government has not identified any other co-conspirators beyond the two defendants charged in this case").

Had the defendants entered a secret agreement to commit fraud, no doubt they would have excluded Mr. McGarrigal and others from their plans.  The participation of Mr. McGarrigal in important meetings and emails, and Mr. Tannin's and Mr. Cioffi's reliance upon his suggestions and advice evidence that there was no conspiratorial agreement in this case.

On a Rule 29 motion, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States* v. *Lorenzo*, 534 F.3d 153, 162 (2d Cir. 2008) (citation omitted) (reversing conviction for conspiracy to distribute cocaine and explaining that the evidence "supports at most an inference that Andrea knew that she was assisting suspicious behavior; viewed in this light, it is also, as Andrea contends, consistent with providing hospitality to her nephew's girlfriend and regretting providing such assistance"). Even when viewed in the light most favorable to the government, the evidence here gives as least as much support to the possibility of an innocent agreement as it does to the possibility of a fraudulent agreement. A judgment of acquittal should therefore be granted on the conspiracy charge in Count 1.

## IX.   THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE THAT MR. TANNIN AIDED AND ABETTED MR. CIOFFI

In addition to failing to prove that Mr. Cioffi committed securities fraud or wire fraud with respect to Counts 2, 3, 5, 6, 7, and 9, the government failed to present sufficient evidence that Mr. Tannin aided or abetted Mr. Cioffi regarding those counts.

To obtain a conviction on an aiding and abetting theory, the government has to prove that "the underlying crime was committed by a person other than the defendant and that the defendant acted, or failed to act in a way that the law required him to act, with the specific purpose of bringing about the underlying crime." *United States* v. *Labat*, 905 F.2d 18, 23 (2d Cir. 1990). The defendant must "consciously assist[] the commission of the specific crime in some active way," *United States* v. *Dickerson*, 508 F.2d 1216, 1218 (2d Cir. 1975), with "the specific intent that his act or omission bring about the underlying crime." *United States* v. *Wiley*, 846 F.2d 150, 154 (2d Cir. 1988) (internal quotation marks and citation omitted).

Allowing the government to proceed before the jury on an aiding and abetting theory would be entirely inconsistent with the way in which the case has been charged and tried.  The government's story has been that Mr. Cioffi and Mr. Tannin worked closely together, shared the same incentives, shared the same concerns, and allegedly worked together to defraud investors in order to benefit their personal pocketbooks and reputations.  This is not an aiding and abetting case, and the Court should not allow the jury to convict on this basis based on the insufficient evidence supporting such a theory at trial.

## X.   THE GOVERNMENT FAILED TO ESTABLISH VENUE IN THE EASTERN DISTRICT FOR THE CONSPIRACY AND SECURITIES FRAUD COUNTS (COUNTS 1 THROUGH 3)

For a charge of conspiracy, "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators."  *United States* v. *Geibel*, 369 F.3d 682, 696 (2d Cir. 2004) (citation and quotation marks omitted).  But where, as here, a defendant is charged with conspiracy *and* one or more substantive offenses, venue lies in the district where all the counts may be tried.  *See United States* v. *Saavedra*, 223 F.3d 85, 89 (2d Cir. 2000).  In a conspiracy case, venue is thus "narrowed by the substantive counts the government" decides to prosecute.  *Id.  See also United States* v. *Mahaffy*, No. 05 Cr. 613, 2006 WL 2224518, at *6 (E.D.N.Y. Aug. 2, 2006).  To determine the proper venue, then, the Court must look to where venue is proper for the securities fraud counts charged here.

Section 27 of the Securities Exchange Act of 1934 governs venue in securities fraud prosecutions.  The statute provides that "[a]ny criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred."  15 U.S.C. § 78aa.  Thus, in a securities fraud case, venue lies in the district where "any act or transaction constituting" the alleged fraud took place.  To identify where a crime took place, "a court must initially identify

the conduct constituting the offense (the nature of the crime) . . . ." *United States* v. *Rodriguez-Moreno*, 526 U.S. 275, 279 (1999).[6]

Here, the defendants have been charged under Section 10(b) of the Securities Exchange Act with making material misstatements and omissions about the Funds in connection with the purchase or sale of a security.[7]  Thus, to prove that "any act or transaction constituting" the fraud took place in the Eastern District of New York, the government must establish that the defendants made at least one misstatement or omission here.

The government failed to meet its burden to prove that defendants made at least one misstatement or omission here.  It also did not establish that an act in furtherance of the alleged conspiracy occurred here.  Venue thus does not lie in the Eastern District of New York for Counts 1, 2, and 3, and Mr. Tannin is entitled to a dismissal of those counts.

## CONCLUSION

For the reasons stated above, Mr. Tannin should be granted a judgment of acquittal on all counts and the case against him should be dismissed in its entirety.

---

[6]    Where a "continuing offense" has been charged, venue may lie in more than one district. A "continuing offense" may be prosecuted "in any district in which such offense was begun, continued, or completed."  18 U.S.C. § 3237(a).   But securities fraud, in contrast to conspiracy, escape from federal custody, or kidnapping, is not a continuing offense.  *See United States* v. *Motz*, 08 Cr. 598, 2009 WL 2486132, at *5 (E.D.N.Y. Aug. 14, 2009) (collecting cases).  Section 10(b) of the Securities Exchange Act does not contemplate "a prolonged course of conduct," where the crime continues after the offense is initially committed.  *Id.* (internal quotations and citation omitted).  Rather, under Section 10(b), one misstatement or misleading omission in connection with the purchase or sale of a security is sufficient to establish a violation.  *See id.* at 6.

[7]    The defendants have been charged under all three subsections of Securities and Exchange Commission Rule 10b-5.  However, as explained in Section II above, this case concerns misrepresentations and omissions only.

Dated:   New York, New York             Respectfully submitted,
        November 2, 2009
                                         **BRUNE & RICHARD LLP**

By:   /s/ Susan E. Brune
           Susan E. Brune
           Nina M. Beattie
           MaryAnn Sung
           BRUNE & RICHARD LLP
           80 Broad Street
           New York, New York 10004
           (212) 668-1900
           sbrune@bruneandrichard.com

           Laurie Edelstein
           BRUNE & RICHARD LLP
           235 Montgomery Street
           San Francisco, California 94104
           (415) 563-0600

           *Attorneys for Matthew Tannin*